ARCO INDUSTRIES CORPORATION v AMERICAN MOTORISTS INSUR-
ANCE COMPANY (ON SECOND REMAND)

Docket No. 210651. Submitted April 3, 1998, at Lansing. Decided October
9, 1998, at 9:10 A.M. Leave to appeal sought.

Arco Industries Corporation and others brought an action in the
Kalamazoo Circuit Court against American Motorists Insurance
Company (AMICO) and other insurers who had issued comprehen-
sive general liability policies to Arco for various periods during the
preceding twenty years, seeking a declaration of AMICO's duty to
defend and indemnify Arco for costs incurred in defending an
underlying action brought by the Department of Natural Resources
against Arco to remedy chemical contamination at Arco's manufac-
turing plant. Following a bench trial, the court, William G. Schma,
J., ordered AMICO to indemnify Arco, finding that Arco had not
expected or intended to harm the environment. However, the court
refused to order AMICO to pay certain costs and fees incurred by
Arco in defending itself in the underlying action. AMICO appealed,
and the plaintiffs cross appealed. The Court of Appeals, MICHAEL J.
KELLY, P.J., and MACKENZIE and BRENNAN, JJ., reversed, holding that
AMICO did not have a duty to defend because Arco should have
expected or did intend harm to the environment. 198 Mich App 347
(1993). The plaintiffs appealed. The Supreme Court held that the
Court of Appeals failed to apply the correct legal standard in deter-
mining whether Arco expected or intended contamination of the
environment, reversed in part, and remanded the matter to the
Court of Appeals for consideration of the issues relating to the duty
to defend that had been raised by Arco in its cross appeal. 448
Mich 395 (1995). On remand, the Court of Appeals, MICHAEL J.
KELLY, P.J., and MACKENZIE and CORRIGAN, JJ., reversed, again hold-
ing that AMICO did not have a duty to defend, this time on the basis
that the AMICO policy provided coverage only where an accident
resulting in bodily injury or property damage occurred during the
policy period and the contamination in question was not discov-
ered until almost eleven years after the expiration of the last policy
issued by AMICO to Arco. 215 Mich App 623 (1996). The plaintiffs
appealed. The Supreme Court reversed, holding that the language

in the standard comprehensive general liability policy that provides coverage for property damage that occurs during the policy period dictates application of an injury-in-fact trigger of coverage rather than the manifestation-of-injury trigger of coverage adopted by the Court of Appeals. 456 Mich 331 (1998). The Supreme Court, in lieu of granting rehearing, amended its judgment order "to provide that the cause is remanded to the Court of Appeals for consideration of the issues raised in that Court but not addressed in its opinion." 456 Mich 1230 (1998).

On second remand the Court of Appeals *held*:

1. The contention of AMICO that the discharge of the chemical contamination into the environment was not sudden and accidental so as to evoke the provision in some of its policies that excluded pollution coverage unless the discharge of contaminants was sudden and accidental is without merit. The Supreme Court in the first of its two opinions in this matter clearly held that the evidence supported the trial court's finding that the release of contamination was accidental. Although the Supreme Court did not separately consider whether the incidents it considered contained the temporal element of suddenness, those incidents all contained the temporal element of being unexpected, compelling the conclusion that Supreme Court would deem those incidents to be sudden. Accordingly, the trial court did not err in finding the "sudden and accidental" exception to the pollution exclusion was applicable.

2. The trial court did not err in holding that coverage under the policies issued by AMICO was not barred by the "owned property" exclusion, which provided that the policies did not apply to property damage to property that was owned, occupied, rented, or used by the insured or in the care, custody, or control of the insured. The expenses relating to remediation of the contaminated soil on Arco's property arose out of the need to halt the spread of contamination to the groundwater, which is not the exclusive property of Arco. The public interest in the well-being of the environment and natural resources of the state is enough to defeat such an exclusion for damages to the insured's own property. Further, such an exclusion does not bar coverage where remediation of an insured's soil is necessary to prevent the migration of contaminants.

3. The trial court allocated the liability among the various insurers who had issued comprehensive general liability policies to Arco during the relevant period on the basis of the so-called "coverage provided" method of allocation, AMICO's allocation being the ratio of the total of the limits of coverage of the AMICO policies to the total of the limits of coverage of all the policies that were in effect over

the period that the damage occurred. Because the Supreme Court determined that AMICO's coverage under the policies it issued was triggered by the injury in fact rather than the manifestation of the injury, the proper method of apportionment among the various insurers is the "time-on-the-risk" method of allocation, which makes each insurer responsible for that portion of the underlying injury that occurred during the period that its policy or policies were in effect and holds an insurer liable for that percentage of the total covered damages that its periods of coverage bears to the total period during which the damages occurred. Because the application of the "time-on-the-risk" method of allocation reduces the percentage of the damages that must be born by AMICO, the matter must be remanded to the trial court for recalculation of AMICO's liability.

4. Because the parties agree that AMICO has no liability for remediation of that part of Arco's facility known as Area II, and because it is not clear from the record whether the trial court included the costs of the remediation of that area in its calculations of AMICO's liability, on remand the trial court should consider the effect of the parties' stipulation that AMICO had no duty to indemnify Arco with respect to Area II.

5. Because the notice letter sent by the Department of Natural Resources in November 1985 informed Arco that it had been identified as the party responsible for groundwater contamination and that it, as a responsible party, was required to determine the extent of contamination and to initiate remedial action, that letter was the functional equivalent of the initiation of a lawsuit, and the receipt of the letter triggered AMICO's duty to defend Arco. Accordingly, the trial court erred in holding that AMICO was not liable for the defense costs incurred by Arco between the date of the receipt of the notice letter and the filing of the complaint in the underlying judicial proceeding.

6. The question whether Arco should have been allowed to recover attorney fees for AMICO's bad-faith breach of its duty to defend was waived by Arco when this case was last before the Court of Appeals and is beyond the present remand order.

7. The trial court did not abuse its discretion in awarding attorney fees on the basis of the fee schedule of the law firm that had been retained by one of the insurers to represent Arco but whose representation had been rejected by Arco rather than the higher fee schedule of the law firm that had been retained directly by Arco. Because the insurer stood ready to provide Arco with a competent defense, and Arco failed to present any substantial or reasonable

reason for rejecting the insurer's tender of representation, Arco is not entitled to recoup attorney fees on the basis of the higher fee schedule of the law firm that it had independently retained.

8. The trial court erred in refusing on the basis that the liability of AMICO under its policies was in reasonable dispute to award Arco interest pursuant to MCL 500.2006(4); MSA 24.12006(4). Where an action to recover unpaid benefits is brought by an insured and is based solely on the insurance contract, the insurer is subject to interest at the rate of twelve percent from sixty days after satisfactory proof of loss pursuant to MCL 500.2006(4); MSA 24.12006(4) even if the claim is reasonably in dispute. On remand, the trial court must modify the award to include interest pursuant to MCL 500.2006(4); MSA 24.12006(4).

9. Arco's claim that the trial court erred in refusing to award it prejudgment interest from the date of the filing of its complaint against AMICO is without merit. Prejudgment interest with respect to insurance claims that arise after the filing of a complaint run from the date the insurer denied the claim of loss rather than the date of the filing of the complaint.

Affirmed in part, reversed in part, and remanded.

1. INSURANCE — EXCLUSIONS — PROPERTY OWNED BY THE INSURED — CONTAMINATION OF GROUNDWATER.

A provision in an insurance policy excluding coverage for damage to property owned by or within the care, custody, or control of an insured does not exclude coverage for damages arising out of the contamination of the groundwater underlying the insured's property and does not prevent the recovery of the costs of the remediation of conditions on an insured property that may lead to contamination of the groundwater.

2. INSURANCE — LIABILITY INSURANCE — MULTIPLE INSURERS — ENVIRONMENTAL POLLUTION — ALLOCATION OF LIABILITY.

The proper method of allocation of liability for costs related to the remediation of environmental pollution among multiple insurers who issued successive comprehensive general liability policies during the period that the events that resulted in the pollution occurred is the "time-on-the-risk" method of allocation, which makes each insurer responsible for that portion of the underlying injury that occurred during the period that its policy or policies were in effect and holds an insurer liable for that percentage of the total covered damages that its periods of coverage bears to the total period during which the damages occurred.

3. INSURANCE — PREJUDGMENT INTEREST — INSURANCE BENEFITS.

    Prejudgment interest on an award of money damages in an action by an insured to recover insurance benefits that were wrongfully denied by the insurer is, with respect to a claim of benefits that was denied by the insurer after the filing of the complaint, awarded from the date the claim was denied rather than from the date of the filing of the complaint (MCL 600.6013; MSA 27A.6013).

*Honigman Miller Schwartz & Cohn* (by *Jay E. Brant, Philip A. Grashoff, Jr.,* and *Mark A. Goldsmith*) and *Butter Durham & Willoughby* (by *Sidney D. Durham*), for the plaintiffs.

*Miller, Canfield, Paddock & Stone* (by *Kevin J. Moody*) and *Drinker Biddle & Reath, LLP* (by *T. Andrew Culbert* and *Paul H. Saint-Antoine*), for the appellee and cross-appellant.

ON SECOND REMAND

Before: CORRIGAN, C.J., and KELLY and MACKENZIE, JJ.

MACKENZIE, J. This declaratory judgment action arises from the refusal of defendant American Motorists Insurance Company (AMICO) to defend and indemnify plaintiffs (collectively referred to as Arco) for costs incurred in an action brought by the Department of Natural Resources (DNR) for remediation of contamination at the automotive parts manufacturing plant of Arco Industries Corporation. Following a bench trial, the trial court entered an order requiring AMICO to indemnify Arco for 68.63 percent of all indemnifiable losses up to the aggregate limits of AMICO's coverage of $3.5 million. This is the third time the case has been before this Court. See *Arco Industries Corp v American Motorists Ins Co*, 198 Mich App 347; 497 NW2d 190 (1993), reversed 448 Mich

395; 531 NW2d 168 (1995) *(Arco I)*, and *Arco Indus-tries Corp v American Motorists Ins Co (On Remand)*, 215 Mich App 633; 546 NW2d 709 (1996), reversed 456 Mich 305; 572 NW2d 617 (1998) *(Arco II)*. The case is before this Court pursuant to a sec-ond remand from the Supreme Court "for considera-tion of the issues raised in [the] Court [of Appeals] but not addressed in its opinion." *Arco Industries Corp v American Motorists Ins Co*, 456 Mich 1230 (1998). We now affirm in part, reverse in part, and remand.

I

The pertinent facts were set forth by the Supreme Court in *Arco I*:

Plaintiff Arco Industries Corporation is a small automo-tive parts manufacturer that has operated a manufacturing plant in Schoolcraft, Michigan, since 1967. As part of the manufacturing process, the automotive parts are dipped into liquid plastisol or vinyl. Volatile organic compounds (VOCs) such as perchloroethylene, trichloroethylene, 1-2 dichloroethylene and vinyl chloride, were used to clean the parts during the manufacturing process and to remove plas-tisol from the plant floors. The plant floor was designed with a trench drain system that drained waste from the plant floor into an unlined seepage lagoon located in the back of the plant. As a result, VOCs contaminated the seep-age lagoon and ground water.

In November, 1985, the Department of Natural Resources notified Arco that the seepage lagoon was contaminated with VOCs, and records indicate that Arco was the source of the contamination. After Arco's failure to resolve the prob-- lem, the DNR [in October, 1987] filed suit against Arco in federal court in an attempt to compel Arco to remedy the VOC contamination and collect claimed response costs. Sub-sequently, [in October, 1989] the State of Michigan and Arco

entered into a consent decree whereby Arco agreed to pay the state $450,000 in response costs together with attorney fees. Arco also agreed to develop and implement a multimillion dollar ground water and soil remediation program. [448 Mich 399-400.]

In February 1987—after Arco received the DNR notice letter, but before the DNR brought its federal suit—Arco filed this declaratory judgment action to compel AMICO, and six other insurers that had issued comprehensive general liability policies to Arco since 1967, to defend and indemnify Arco in any potential DNR action.[1] AMICO had issued annual comprehensive general liability policies to Arco covering the years 1968 through 1974. In each of the policies, AMICO agreed to "pay all sums which the insured shall become legally obligated to pay as damages because of (a) bodily injury or (b) property damage to which this insurance applies, caused by an occurrence," and an "occurrence" was defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policies also included an "owned property" exclusion and, in addition, three of the policies contained a pollution exclusion.

*Arco I, supra,* involved AMICO's claim that there was no "occurrence" that would require it to indemnify Arco for its remediation costs. In that case, the Supreme Court determined that several discharges at the Arco plant were accidents, 448 Mich 406-407, and that Arco and its employees did not intend or expect

---

[1] The other six insurers settled with Arco before trial.

the resultant environmental contamination. 448 Mich 418. The Court therefore concluded that the release of VOCs constituted a covered occurrence under AMICO's policies.

*Arco II, supra,* addressed AMICO's claim that, even if Arco's release of VOCs was an "occurrence," coverage was not triggered until the VOC-contaminated groundwater was discovered in 1985—well after the last of AMICO policies was no longer in effect. The *Arco II* Court held that because the policies define an "occurrence" as an accident that results in property damage "during the policy period," the policies dictate an injury-in-fact approach to the question of when coverage was triggered. 456 Mich 319-320. Under that approach, coverage is triggered when exposure to the pollutants results in actual property damage. *Id.,* p 313. The Court was apparently satisfied that Arco's discharge of solvents resulted in property damage from 1968 to 1974; it "affirm[ed] the trial court's findings that there had been coverage triggering occurrences in each of the defendant's policy periods." *Id.,* p 330.

We now turn to the parties' remaining claims.

II

Three of the seven AMICO policies contain a pollution exclusion that excludes from coverage claims arising out of the discharge of contaminants, unless the discharge is "sudden and accidental." In its appeal, AMICO contends that the discharges at the Arco plant were neither sudden nor accidental, so that Arco's claims were not covered. The Supreme Court's

opinion in *Arco I, supra,* leads us to conclude otherwise.

In *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197; 476 NW2d 392 (1991), the Supreme Court addressed the meaning of "sudden and accidental" in a pollution exclusion clause. The Court stated:

> We conclude that when considered in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected." [*United States Fidelity & Guaranty Co v*] *Star Fire Coals,* [*Inc,* 856 F2d 31, 34 (CA 6, 1988)]. The common, everyday understanding of the term "sudden" is " 'happening, coming, made or done quickly, without warning or unexpectedly; abrupt.' " *FL Aerospace* [*v Aetna Casualty & Surety Co,* 897 F2d 214, 219 (CA 6, 1990)]. "Accidental" means "[o]ccurring unexpectedly and unintentionally; by chance." *The American Heritage Dictionary: Second College Edition,* p 72. [*Id.* pp 207-208.]

When determining whether a discharge is "sudden and accidental," the focus is on the initial entry of the pollutants into the environment, and not the subsequent migration of the pollutants after their release. *Protective Nat'l Ins Co of Omaha v Woodhaven,* 438 Mich 154, 161-162; 476 NW2d 374 (1991). See also *Polkow v Citizens Ins Co of America,* 438 Mich 174, 179; 476 NW2d 382 (1991).

In *Arco I, supra,* the Supreme Court stated that "[t]he trial court found that there were definitely unintentional, accidental releases of VOCs [at the Arco plant], and we hold that this was fully supported by the evidence." 448 Mich 405. The Court then presented a list of incidents during the policy periods illustrating the accidental character of the releases,

including (1) several unintentional spills of mop buckets holding four to five gallons of solvents, most of which went into the drain system and seepage pond, (2) drums of solvents being punctured by forklifts or hunters' guns and leaking into the ground, and (3) numerous spills of drums of solvents while being transported within the plant or transferred into a holding tank, resulting in several gallons of solvents going into the drain. 448 Mich 406. The Court declared that "[t]hese incidences indicate that the spills were unintentional and constituted accidents. There is ample evidence establishing that they were an undesigned contingency, not anticipated, and not naturally to be expected." 448 Mich 406-407. Thus, the Supreme Court has expressly determined that Arco's release of the solvents into the environment was unexpected and accidental.

Although the Supreme Court did not separately consider whether the listed incidents contained the temporal element of suddenness, an examination of the incidents relied on by the Court in affirming the trial court's findings reveals that each of these incidents contains a temporal element as well as being unexpected: a bucket spilling, a drum tipping, drums being shot or punctured by a forklift are all events that are "made or done quickly, without warning or unexpectedly; abrupt." *Upjohn, supra*, p 207. This compels the conclusion that the Supreme Court would likewise deem that the incidents were sufficiently unexpected to be considered "sudden."

In light of *Arco I*, we must conclude that the trial court did not err in determining that the incidents were within the "sudden and accidental" exception to

the pollution exclusion, so that the exclusion did not preclude coverage.

### III

Amico also contends that the trial court erred in determining that the "owned property" exclusion did not bar coverage for the cost of remediating the soil and seepage pond on Arco's property. That exclusion states that the policies do not apply to property damage to "(1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exerting physical control." Amico essentially concedes that the "owned property" exclusion does not apply to the groundwater beneath the Arco facility, but asserts that the exclusion precludes coverage for the expenses relating to remediation of the contaminated soil on Arco's property. The trial court ruled that the exclusion did not bar coverage because the failure to clean up the soil and seepage pond at the site would further contaminate the groundwater. We agree with the trial court.

In *United States Aviex Co v Travelers Ins Co*, 125 Mich App 579, 590-592; 336 NW2d 838 (1983), this Court held that an "owned property" exclusion will not bar coverage where an insured's on-site contamination has spread to groundwater percolating beneath the insured's property. The reasoning behind the holding was that the groundwater was not the exclusive property of the landowner. *Id.* This reasoning was expanded in *Upjohn Co v New Hampshire Ins Co*, 178 Mich App 706, 719-720; 444 NW2d 813 (1989),

reversed on other grounds 438 Mich 197; 476 NW2d 392 (1991). There, the subsoil at an Upjohn facility was contaminated as the result of a leaking underground storage tank and the contaminants were slowly making their way into the groundwater. This Court observed that "the improper release of toxic wastes may cause property damage not only to the actual owner of the land, but also to the government because of its independent interest, behind the titles of its citizens, in all the air and earth (i.e., its natural resources) within its domain." *Id.*, p 720. Finally, in *Polkow v Citizens Ins Co of America*, 180 Mich App 651, 659; 447 NW2d 853 (1989), reversed on other grounds 438 Mich 174; 476 NW2d 382 (1991), this Court again held that an "owned property" exclusion would not bar coverage associated with groundwater contamination. Significantly, the panel also stated that the public interest in the purity of not only groundwater, but the environment and the state's natural resources as a whole, is significant enough to defeat an "owned property" exclusion:

> [W]e conclude that the alleged contamination in this case [contaminated soil on the insured's property causing contaminated groundwater] falls outside of the policy exclusion for damage to the insured's own property for reasons broader in scope [than the reasoning of *Aviex, supra*]. We hold that these allegations are essentially for injury to the public interest in the well-being of the environment and natural resources of this state. This public interest is apparent in the tenor of the statutory framework for environmental protection which, as we have already alluded, vests the DNR and the Attorney General with substantial powers to preserve and protect the environment. This public interest was noted in *Aviex, supra*, p 589, where the Court stated that the statutory provision of MCL 323.10; MSA 3.529(1) [now

MCL 324.3115(2); MSA 13A.3115(2)] authorizing suit by the Attorney General for civil damages to natural resources "clearly indicates the state's interest in its natural resources." That this public interest is enough to defeat an exclusion for damage to the insured's own property was acknowledged in [*Fireman's Fund Ins Cos v*] *Ex-Cell-O Corp*, [662 F Supp 71], 75 [(ED Mich, 1987)] and *Upjohn* [*supra*, p 720]. [*Id.*, pp 659-660.]

Thus, in environmental contamination clean-up cases, this Court has long recognized an independent public interest in the state's natural resources that supersedes any "owned property" exclusion. *Anderson Development Co v Travelers Indemnity Co*, 49 F3d 1128, 1134 (CA 6, 1995). This view is consistent with the case law from other jurisdictions. See, e.g., *Intel Corp v Hartford Accident & Indemnity Co*, 952 F2d 1551, 1565-1566 (CA 9, 1991); *Pepper's Steel & Alloys, Inc v United States Fidelity & Guaranty Co*, 668 F Supp 1541, 1550 (SD Fla, 1987). See also anno: *Liability insurance coverage for violations of antipollution laws*, 87 ALR4th 444.

Even in the absence of an overriding public interest in the state's natural resources, the case law of the majority of other jurisdictions holds that on-site soil clean-up is not barred by an "owned property" exclusion where there is a threat that the contaminants in the insured's soil would migrate to the groundwater or to the property of others. See, e.g., *South Carolina Ins Co v Coody*, 813 F Supp 1570, 1578-1579 (MD Ga, 1993); *Chemical Leaman Tank Lines, Inc v Aetna Casualty & Surety Co*, 788 F Supp 846, 852-853 (D NJ, 1992); *Boyce Thompson Institute for Plant Research, Inc v Ins Co of North America*, 751 F Supp 1137, 1141 (SD NY, 1990); *New Castle Co v Continen-*

*tal Casualty Co*, 725 F Supp 800, 816-817 (D Del, 1989), aff'd in part and rev'd in part on other grounds sub nom *New Castle Co v Hartford Accident & Indemnity Co*, 933 F2d 1162 (CA 3, 1991). See also cases cited in 87 ALR4th 444, § 28, pp 539-549.

Here, the trial court found that there was a substantial threat that the contaminants in the soil and seepage pond on Arco's premises would migrate into the groundwater absent remediation of the soil. This finding is supported by the record. Thus, under either the theory that the "owned property" exclusion does not bar coverage on public policy grounds, *Polkow*, *supra*, or the theory that the exclusion does not bar coverage where remediation of the insured's soil is necessary to prevent the migration of contaminants, the "owned property" exclusion did not bar coverage in this case.

IV

AMICO's final claim is that the trial court erred in its allocation of Arco's insurers' responsibility for Arco's indemnifiable losses. Allocation of responsibility for coverage among insurers becomes relevant once it is determined under which policies coverage has been triggered. See comment: *Apportioning coverage responsibility of consecutive insurers when the actual occurrence of injury cannot be ascertained: Who has to contribute in a settlement?*, 49 Mercer L R 1151, 1157 (1998). In this case, given the six other insurers' settlements with Arco and the Supreme Court's decision in *Arco II*, it appears that coverage was triggered—that is, that there was an injury-in-fact as defined in *Arco II*—under each successive compre-

hensive general liability policy in effect during the twenty years between the time Arco began operating the facility and the cessation of wastewater discharges into its seepage lagoon in 1987.

According to the trial court's opinion in this case, the allocation of a 68.63 percent share of indemnifiable losses to AMICO represents "the ratio of [AMICO's] limits to the limits available under all the policies which were effective over the period of time which the damage occurred." This allocation was apparently based on an "other insurance" provision contained in the seven AMICO policies.

A

Courts and commentators have discussed five possible methods for allocating liability among successive insurance policies in cases involving property damage or injuries occurring over the course of several years. See, generally, comment: *Allocating progressive injury liability among successive insurance policies*, 64 U Chi L R 257 (1997), cited in *Arco II*, *supra*, 456 Mich 312, 314. These methods are generally referred to as the "joint and several liability" or "all sums" method, the "stacking coverage" method, the "coverage provided" method, the "other insurance" method, and the "time-on-the-risk" method. *Id.*

Under the "all sums" method of allocation, each triggered insurer is liable for the insured's entire loss, even though the injury giving rise to liability may have begun before, and continued after, the insurer's policy period. One insurer pays the entire loss and then may seek contribution from other triggered insurers under the common-law doctrine of contribu-

tion or pursuant to each policy's "other insurance" clause. See, e.g., *Keene Corp v Ins Co of North America*, 215 US App DC 156; 667 F2d 1034 (1981).

Under the "stacking coverage" method of allocation, the coverage limits of all triggered policies are aggregated and the insured is allowed to exhaust the coverage limits of all the policies up to the level of its loss—again, regardless of whether the underlying injury was sustained before or after the policies' coverage period. 64 U Chi L R 257, 273-274. This method also appears to permit a selected insurer to sue other triggered insurers for contribution if the injury does not exhaust the coverage limits of all triggered policies. *Id.* See, e.g., *Cole v Celotex Corp*, 599 So 2d 1058 (La, 1992).

Under the "coverage provided" method of allocation, liability is determined by multiplying the number of years an insurer provided coverage by the limits of that insurer's policies, and then assigning liability corresponding to the ratio of the total coverage provided by that insurer to the total coverage provided by all the triggered policies. 64 U Chi L R 257, 274-275. See, e.g., *Owens-Illinois, Inc v United Ins Co*, 138 NJ 437; 650 A2d 974 (1994). The fourth method of allocation, the "other insurance" clause approach, appears to be a refinement of the "all sums" method in which allocation is based on principles of joint and several liability. See 64 U Chi L R 257, 278-279.

The final method of allocation is the "time-on-the-risk" approach. This method allocates liability among triggered policies using the periods covered by each insurer without considering the coverage limits of the triggered policies. 64 U Chi L R 257, 280. See, e.g., *Ins*

*Co of North America v Forty-Eight Insulations, Inc,*
633 F2d 1212 (CA 6, 1980). Under this method, insur-
ers are responsible for the portion of the underlying
injury that occurred during their policy period; the
effect is to prorate coverage for continuous damage
across each period that the damage occurred.

B

We are of the opinion that the "time-on-the-risk"
method of apportionment should be used in cases
such as this one, involving continuous property dam-
age and successive policies of liability coverage. We
reach this conclusion primarily on the basis of the
Supreme Court's decision in *Arco II, supra,* where
the Court applied the "injury-in-fact" trigger of cover-
age. The *Arco II* Court made it clear that, under the
language of the AMICO policies, coverage was available
to Arco when actual property damage occurred "dur-
ing the policy period." The logical corollary is that
AMICO must provide coverage for damage sustained
"during the policy period," but not for the years
outside the policy period. As stated in *Northern
States Power Co v Fidelity & Casualty Co of New
York,* 523 NW2d 657, 662 (Minn, 1994):

> [T]he choice of trigger theory is related to the method a
> court will choose to allocate damages between insurers. . . .
> A "pro rata by limits" [or "all sums"] allocation is inconsis-
> tent with the actual injury [or "injury-in-fact"] trigger theory.
>
> The essence of the actual injury trigger is that each
> insurer is held liable for only those damages which
> occurred during its policy period; no insurer is held liable
> for damages outside its policy period. Where policy periods
> do not overlap, therefore, the insurers are consecutively,
> not concurrently liable. A "pro rata by limits" allocation

method effectively makes those insurers with higher limits liable for damages incurred outside their policy periods and is therefore inconsistent with the actual trigger theory.

*Arco II* instructs that the policy language in this case states unequivocally that the policies apply to damage and injury that take place "during the policy period." Consequently, we must reject any method of allocation that would require AMICO to provide coverage on a joint and several or "all sums" basis, since that method would require AMICO to indemnify Arco for damage occurring outside the policy period.

Our decision is strengthened by the history of comprehensive general liability policies as a whole. The seminal case adopting the "injury-in-fact" trigger of coverage, *American Home Products Corp v Liberty Mut Ins Co*, 565 F Supp 1485, 1500-1503 (SD NY, 1983), aff'd as modified 748 F2d 760 (CA 2, 1984), provides an extensive discussion regarding the intention of the drafters of the standard comprehensive general liability (CGL) policy, including the following:

[T]he evidence establishes that the CGL draftsmen, as well as the parties, contemplated coverage only for injuries shown in fact to have occurred during periods of coverage.

\*        \*        \*

. . . For example, Richard Elliott, then Secretary of the National Bureau of Casualty Underwriters, in presenting what he described as "the underwriting intent" of the CGL's revisers, explained that "the definition of occurrence serves to identify the time of loss for the purpose of applying coverage—the injury must take place during the policy period." He recognized that long exposure could involve "cumulative injuries," in which "more than one policy afford[s] coverage," and "each policy will afford coverage to the bodily

injury or property damage which occurs during the policy period." . . . [Another commentator stated:] "Injury or damage must occur during the policy period to be covered."

Thus, it appears that the intent of the drafters of the policies at issue here, whose language we are required to uphold, was to provide coverage for the policy period only, and not for damages arising before or after the policy period. Again, this intent precludes imposition of an "all sums" or joint and several liability approach. "While the insurers agreed to indemnify [the insured] for 'all sums,' it had to be for sums incurred during the policy period." *Outboard Marine Corp v Liberty Mut Ins Co*, 283 Ill App 3d 630, 642; 670 NE2d 740 (1996).

Finally, we note the commentators' preference for the "time-on-the-risk" method of allocating responsibility among successive insurers. As stated in 64 U Chi L R 257, 281-283:

The time-on-the-risk method should be adopted by courts because its inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates.

Courts can easily administer the time-on-the-risk method. Once a court determines the scope of the progressive injury, that is, the total damage . . . it can readily allocate the damages among the triggered policies. The court divides the total damages by the number of triggered years and simply allocates to each year the result. If, for example, a certain policy spans three years out of a total of ten triggered years, then thirty percent of the damages will be allocated to that policy.

Unlike the *Owens-Illinois* method, the effects of deductibles, excess insurance, and self-insurance are easy to calculate by pretending that the policy's share of damages was

the damage that actually occurred during that policy period.
. . .

The time-on-the-risk method has intuitive, commonsense appeal . . . .

The simplicity of the time-on-the-risk method removes many of the incentives to litigate the allocation of damages. Since the parties will know in advance how the court will allocate liability, there is much less of the uncertainty that encourages wasteful litigation. . . . While there will still be many issues to litigate, such as which policies are triggered and total damages, reducing the amount of allocation litigation should substantially decrease the costs of insurance.

In addition to decreasing the amount of litigation, this method provides a way for insurance companies to estimate more accurately total expected liability; as a result premiums should decline. . . . Because this method, unlike the *Owens-Illinois* method, does not rely on a case-by-case determination of how much coverage was purchased, it also obviates the concern about inconsistent application.

See also 49 Mercer L R 1151, 1159-1166.

C

Because we conclude that each insurer in this case is responsible for coverage "during [its] policy period," and is not jointly and severally responsible for providing coverage for all policy periods, we cannot agree with the trial court's reliance on the "other insurance" clauses of the AMICO policies in apportioning AMICO's share of liability. "Other insurance" clauses do not provide a solution to the allocation problem here because they were not meant to allocate liability among successive insurers. 64 U Chi L R 257, 278. Rather, they relate to the effect of concurrent coverages of a single occurrence. *Continental Casualty Co v Medical Protective Co*, 859 SW2d 789, 791 (Mo App,

1993). They are individual contractual agreements between the insured and the insurer, designed to prevent the insured from recovering multiple times for an injury that occurs at one point in time. 64 U Chi L R 257, 279. Because this case involves consecutive policies covering different policy periods, we conclude that the "other insurance" clauses have no application.

D

Applying the "time-on-the-risk" method of allocating the insurers' liability in this case, we reverse the judgment of the trial court holding AMICO responsible for 68.63 percent of Arco's indemnifiable losses. As previously noted, the coverages of the various insurers were triggered over a twenty-year period, from 1967 to 1987. AMICO was Arco's liability insurer for seven of those years, from 1968 to 1974. Under the time-on-the-risk method of allocation, therefore, AMICO was responsible for 7/20ths, or thirty-five percent, of Arco's losses. Accordingly, we remand for a recalculation of AMICO's liability applying the time-on-the-risk method.

E

Finally, the parties are in agreement that AMICO has no indemnity obligation with regard to the costs of remediating Area II of Arco's facility. The record is not clear with regard to whether the trial court included the costs of remediating Area II in its calculations, nor is it clear what effect exclusion of the remediation costs attributable to Area II would have on the judgment. On remand, therefore, the trial court should consider the effect of the parties' stipulation that

AMICO had no duty to indemnify Arco with regard to Area II.

V

In its cross appeal, Arco argues that the trial court erred in determining that Arco was not entitled to defense costs incurred between the time it received the November 1985 notice letter from the DNR and the filing of the complaint in the underlying federal court action in October 1987. We agree.

In *Arco I, supra*, 448 Mich 417, n 15, the Supreme Court noted its expectation that this Court would find guidance on this issue in *Michigan Millers Mut Ins Co v Bronson Plating Co*, 445 Mich 558, 572-575; 519 NW2d 864 (1994). In *Bronson Plating*, the Supreme Court held that a PRP (potentially responsible party) letter from the Environmental Protection Agency to an insured was the functional equivalent of the initiation of a lawsuit, giving rise to the insurer's duty to defend. More recently, in *South Macomb Disposal Authority v American Ins Co (On Remand)*, 225 Mich App 635, 660-668; 572 NW2d 686 (1997), this Court held that notice letters to an insured from the DNR were analogous to a PRP letter and constituted the initiation of a suit that gave rise to an insurer's duty to defend. In both cases, the Courts looked primarily to the contents of the letters and the authority of the agencies that prepared the letters. The Courts then concluded that because the letters carried immediate and severe implications and were prepared by agencies with substantial regulatory authority, they were the functional equivalent of a lawsuit for purposes of triggering the insurers' duty to defend. See *Bronson*

*Plating, supra,* pp 573-574; *South Macomb, supra,* pp 667-668.

The notice letter from the DNR involved in this case informed Arco that it had been identified as the party responsible for groundwater contamination and notified Arco that, as a responsible party, it was required to determine the extent of contamination and to initiate remedial action. The letter further "requested" the submission of "plan of intent to investigate the extent of groundwater contamination for which you are responsible" to the DNR by a specific date. Although the letter was not as strongly worded as the letters in *Bronson Plating* and *South Macomb,* the clear implication of the letter was that Arco was causing unlawful pollution and the DNR intended to take enforcement action to remedy the situation. Further, as indicated in *South Macomb, supra,* p 667, the DNR had the power to take substantial action against Arco. In short, the letter was not a " 'garden variety' demand letter[], which expose[s] one only to a potential threat of litigation." *Id.,* p 668. Rather, consistent with the reasoning of *South Macomb* and *Bronson Plating, supra,* the notice letter from the DNR in this case constituted a "suit" for purposes of triggering AMICO's duty to defend. Accordingly, we reverse the trial court's ruling that Arco was not entitled to defense costs incurred before the federal suit was filed. On remand, the trial court shall determine the amount of those costs.

VI

Arco next contends that it should have been allowed to recover attorney fees for AMICO's bad-faith

breach of its duty to defend. However, Arco waived this issue when the case was last before this Court; it is therefore beyond the scope of the present remand order. In any event, the claim is without merit. See *Burnside v State Farm Fire & Casualty Co*, 208 Mich App 422; 528 NW2d 749 (1995); *Auto Club Ins Ass'n v State Farm Ins Cos*, 221 Mich App 154, 167-168; 561 NW2d 445 (1997).

VII

Arco next argues that the trial court abused its discretion by limiting its award of attorney fees to a particular rate schedule. Some additional factual background is necessary to consider this claim.

The DNR sent its notice letter to Arco in November 1985. In May 1986, another of Arco's insurers retained the firm of Plunkett & Cooney to defend Arco. Arco rejected the tendered defense, apparently because it had already retained the firm of Honigman Miller Schwartz & Cohn.

The trial court's award of attorney fees was based on the rates Plunkett & Cooney would have charged the other insurance company, although Arco's representation was actually provided by the Honigman firm at a higher rate. In denying Arco's motion to increase the award to match the Honigman firm's rates, the court noted that Plunkett & Cooney is a "recognized and respected law firm" with an environmental law section and concluded that Arco had no reasonable basis for rejecting the tendered defense.

On appeal, Arco contends that Plunkett & Cooney's rates should not have been used to calculate its reasonable attorney fees because the firm could not have

represented Arco because of a conflict of interest. This argument is without merit for two reasons. First, by Arco's own admission, the alleged "conflict" did not arise until June 1987, a year after Arco rejected the tender of representation by Plunkett & Cooney. Second, had Arco accepted the tender, Plunkett & Cooney quite possibly could have avoided the conflict by declining to represent the party that resulted in the conflict of interest. Moreover, even if an unavoidable conflict existed, Arco's insurers might have retained other counsel at rates similar to those of Plunkett & Cooney.

Arco has failed to present any substantial or reasonable reason for rejecting the other insurer's tender of representation. Because Arco's insurer stood ready to provide it with a competent defense at a quoted fee scale, Arco was not entitled to recoup attorney fees at a higher rate. Under these circumstances, we find no abuse of discretion in the trial court's calculation of attorney fees at the rate quoted by Plunkett & Cooney.

VIII

Arco also claims that the trial court erred in determining that Arco could not collect twelve percent penalty interest pursuant to MCL 500.2006; MSA 24.12006 because coverage was reasonably in dispute. We must conclude that Arco is correct.

MCL 500.2006; MSA 24.12006 provides in relevant part:

> (1) A person [including an insurer; see MCL 500.114; MSA 24.1114] must pay on a timely basis to its insured . . . the benefits provided under the terms of the policy . . . .

* * *

(4) When benefits are not paid on a timely basis the benefits paid shall bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum, if the claimant is the insured or an individual or entity directly entitled to benefits under the insured's contract of insurance. Where the claimant is a third party tort claimant, then the benefits paid shall bear interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% per annum *if the liability of the insurer for the claim is not reasonably in dispute* . . . . The interest shall be paid in addition to and at the time of payment of the loss . . . . Interest paid pursuant to this section shall be offset by any award of interest that is payable by the insurer pursuant to the award. [Emphasis added.]

In *Yaldo v North Pointe Ins Co*, 457 Mich 341, 348-349; 578 NW2d 274 (1998), the Supreme Court recently addressed the question whether the twelve percent interest allowed under MCL 500.2006(4); MSA 24.12006(4) is available to an insured only when the claim for coverage is not reasonably in dispute. The Court concluded that, "[w]ith respect to collection of twelve percent interest, reasonable dispute is applicable only when the claimant is a third-party tort claimant." *Yaldo, supra*, p 349. Thus, "[w]here the action is based solely on contract, the insurance company can be penalized with twelve percent interest, even if the claim is reasonably in dispute." *Id.*, p 348, n 4.

Under *Yaldo*, AMICO could be assessed penalty interest pursuant to MCL 500.2006(4); MSA 24.12006(4) even though Arco's claim for coverage was reasona-

bly in dispute. Accordingly, on remand the trial court shall modify Arco's award to include that interest.

IX

Finally, Arco contends that the trial court erred in ruling that Arco should not receive prejudgment interest under MCL 600.6013; MSA 27A.6013 from the date it filed its complaint for declaratory judgment against AMICO. This claim is without merit. As Arco acknowledges, this Court has held that, in actions to collect benefits of insurance contracts, it is error to award prejudgment interest pursuant to MCL 600.6013; MSA 27A.6013 from the date of the complaint with respect to claims that arise after the complaint is filed. *Beach v State Farm Mut Automobile Ins Co*, 216 Mich App 612, 624-625; 550 NW2d 580 (1996). Rather, prejudgment interest with respect to claims that arise after the filing of the complaint is properly awarded from the postcomplaint date on which the insurer refused to pay and the delay in receiving money began. *Id.* See also *McKelvie v Automobile Club Ins Ass'n*, 203 Mich App 331, 339-340; 512 NW2d 74 (1994). Here, Arco filed its complaint for declaratory relief against AMICO more than 2-1/2 years before the entry of the 1989 federal consent decree making Arco liable for response costs and remediation program funding. Under *Beach*, therefore, Arco was entitled to prejudgment interest dating back only to the date on which AMICO refused coverage for that loss; it was not entitled to prejudgment interest dating back to the filing of the complaint against AMICO in 1987.

X

To summarize, we affirm the trial court's determination that the pollution and "owned property" exclusions contained in AMICO's policies did not bar coverage; AMICO was required to indemnify Arco for a share of Arco's losses resulting from its discharge of solvents from 1967 to 1987. However, we conclude that the trial court erred in allocating AMICO's share of responsibility for indemnification in relation to the six other insurers that covered Arco during that twenty-year period; the court should have allocated responsibility based on a "time-on-the-risk" approach. We therefore remand for recalculation of AMICO's indemnification obligation.

With regard to AMICO's duty to defend in the underlying federal action brought by the DNR, we find no abuse of discretion in the trial court's award of attorney fees. We also find no error in the court's refusal to allow prejudgment interest for the period between the filing of the complaint in this case and the entry of the consent judgment in the federal case. However, we reverse the trial court's determination that Arco was not entitled to defense costs incurred before suit was filed in the federal court. Additionally, we reverse the court's determination that Arco was barred from receiving twelve percent penalty interest under MCL 500.2006; MSA 24.12006; the fact that Arco's claim was reasonably in dispute was irrelevant. Consequently, those items should be calculated and added to the judgment on remand.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.