# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST,<br><br>Plaintiff,<br><br>v.<br><br>ALLIANZ INSURANCE COMPANY, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. N11C-12-022 PRW CCLD<br>)<br>)<br>)<br>)<br>) |

Submitted: May 25, 2017
Decided: June 8, 2017
Corrected: June 19, 2017

## MEMORANDUM OPINION AND ORDER

*Upon Defendants OneBeacon Ins. Co. & Continental Casualty Ins. Co.'s Motions for Summary Judgment on Trigger and Suit Limitations,*
***DENIED.***

*Upon Defendant OneBeacon Ins. Co.'s Motion for Summary Judgment on Transfer of Rights,*
***DENIED.***

*Upon Plaintiff Motors Liquidation Co. DIP Lenders Trust's Cross-Motions for Summary Judgment on Transfer of Rights and Trigger,*
***GRANTED.***

*Upon Defendants OneBeacon Ins. Co. & Continental Casualty Ins. Co.'s Cross-Motions for Partial Summary Judgment on Number of Occurrences,*
***DENIED.***

*Upon Plaintiff Motors Liquidation Co. DIP Lenders Trust's Renewed Motion for Partial Summary Judgment on the Number of Occurrences,*
***GRANTED.***

*Upon Defendants OneBeacon Ins. Co. & Continental Casualty Ins. Co.'s Cross-Motions for Summary Judgment on Allocation,*
**GRANTED.**

*Upon Plaintiff Motors Liquidation Co. DIP Lenders Trust's Renewed Motion for Partial Summary Judgment on Allocation,*
**DENIED.**

Jennifer C. Wasson, Esquire, Carla M. Jones, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE, Selena J. Linde, Esquire (*pro hac vice*), Michael T. Sharkey, Esquire (*pro hac vice*) (argued), Perkins Coie LLP, Washington, D.C., Attorneys for Plaintiffs Motors Liquidation Co. DIP Lenders Trust.

Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE, John S. Favate, Esquire (*pro hac vice*) (argued), Henry T.M. LeFevre-Snee, Esquire (*pro hac vice*) (argued), Hardin, Kundala, McKeon & Poletto, P.A., Attorneys for Defendant OneBeacon Insurance Company.

Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE, Ronald P. Schiller, Esquire (*pro hac vice*), Michael R. Carlson, Esquire (*pro hac vice*), Lisa M. Salazar, Esquire (*pro hac vice*) (argued), Hangley Aronchick Segal Pudlin & Schiller, Attorneys for Defendant Continental Casualty Insurance Company.

**WALLACE, J.**

## I.  INTRODUCTION

Plaintiff Motors Liquidation Trust DIP Lenders Trust ("Motors") sued several excess carriers, seeking coverage for underlying asbestos claims brought against General Motors ("GM"). OneBeacon Insurance Company ("OneBeacon") issued three excess policies from 1969 to 1972. Defendant Continental Casualty Company ("Continental") purportedly issued two excess policies from 1969 to 1971. The parties bring a series of motions seeking summary judgment on Defendants' liability, if any, and the proper framework under which to evaluate and allocate Motors's claims.

First, OneBeacon argues its insurance policies were excluded from the asset transfer between GM and Motors during GM's bankruptcy. Naturally, Motors says that the policies were properly transferred from GM, and that OneBeacon still retains adopted responsibility under those policies.

Second, OneBeacon argues its insurance policies were not triggered because the liability policies that underlay them were never triggered. Motors contends these pre-1972 policies were, in fact, triggered because they are occurrence-based.

Third, OneBeacon argues the underlying policies' Suit Limitations Clause bars Motors's claims because Motors filed suit years beyond the limitations period.

Fourth, the parties disagree on the definition of "occurrence" as it pertains to policy coverage. Motors contends all of the remaining asbestos claims stem from

GM's initial parts' manufacture. Conversely, OneBeacon says that each claim is its own occurrence deriving from each claimant's alleged exposure to GM's parts.

Finally, the parties disagree on how to determine allocation. Motors contends that any allocation must be done on an "all sums" basis. OneBeacon says allocation must be done on a "pro rata" basis.

Continental, if it must, joins all of OneBeacon's summary judgment motions except OneBeacon's motion for summary judgment regarding transfer. The Court puts it that way because Continental has posited that Motors has not provided sufficient evidence to show Continental's policies follow form to the underlying Royal policies and therefore has failed to establish it has any liability here.

The Court's introduction to and recitation of the factual and procedural history of this litigation is set forth in the Court's previous decisions.[1] The Court will, therefore, not undertake a protracted recounting thereof, but only briefly set forth that expressly necessary for this ruling.

---

[1] *Motors Liquidation Co., Dip Lenders Trust v. Allianz Ins. Co., et al.,* 2013 WL 7095859 (Del. Super. Ct. Dec. 31, 2013) ("*Motors I*"); *Motors Liquidation Co. Dip Lenders Trust v. Allianz Ins. Co., et al.,* 2015 WL 10376123 (Del. Super. Ct. Nov. 25, 2015), *reargument denied,* 2016 WL 825473 (Del. Super. Ct. Mar. 2, 2016) ("*Motors II*").

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. GM'S INSURANCE TOWERS

GM and Royal Insurance Company ("Royal") had a longstanding insurance relationship, beginning in approximately 1921 and continuing through September 1, 1993.[2] On August 18, 1954, Royal issued RTP 060000 to GM, which was effective "until canceled."[3] Section IV of RTP 060000, entitled "Policy Period, Territory," provided as follows:

> This policy applies worldwide, only to occurrences [defined as: "an event, or continuous or repeated exposure to conditions, which unexpectedly cause bodily injury . . ."] during the policy period provided the services, goods or products were manufactured, sold, handled or distributed within the United States of America, its territories, possessions, or Canada.[4]

---

[2] Transmittal Aff. of Carmella P. Keener in Connection with OneBeacon Insurance Company's Mot. for Summ. J. on Trigger, Ex. 4, at MLC DE 0004768–0004769 [hereinafter "Keener Trigger Aff."].

[3] *Id.* Ex. 6 ("RTP 060000"), at MLC DE 0000007.

[4] *Id.* at MLC DE 0000004

## 1. OneBeacon's Policies[5]

Between November 1, 1969, and March 21, 1972, OneBeacon issued three excess insurance policies to GM (collectively, the "OneBeacon Policies").[6] The OneBeacon Policies followed form to Royal Catastrophe Excess Policy RLA 35 ("RLA 35").[7] RLA 35, in turn, followed form to RTP 060000:

> [T]his Insurance is subject to the same warranties, terms and conditions (except as regards the premium, the obligation to investigate and defend, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Insurance prior to a happening for which claim is made hereunder.[8]

RTP060000 defines "occurrence" as: "an event, or continuous or repeated exposure to conditions, which unexpectedly cause bodily injury[.]"[9]

---

[5]    OneBeacon is the Transferee of the Liabilities of American Employers Insurance Company. *See* Pl. Motors Liquidation Co. DIP Lenders Trust's Opp. to Def. OneBeacon Insurance Company's Mot. for Summ. J. on the Alleged Transfer of Rights Under the OneBeacon Policies and Cross-Mot. for Summ. J. on the Transfer of Rights Under the OneBeacon Policies at 3, n. 3 [hereinafter "Pl.'s Opp'n. & Cross-Mot. on Transfer."]. For ease of reference, the Court will simply use OneBeacon throughout.

[6]    Keener Trigger Aff. Ex. 1.

[7]    *Id.* Ex. 1, at MLC DE 0000243, MLC DE 0000280, and MLC DE 0000334.

[8]    *Id.* Ex. 7, at MLC DE 0000198.

[9]    *See* Affidavit of Christina E. Buschmann in Supp. of. Pl.'s Two Renewed Mots. For Summ. J. Ex. 3 (RTP 060000), at MLC DE 0000003–MLC DE 0000005.

RLA35 states that the insurance company covers all sums GM becomes liable to pay arising out of continuous and repeated exposure to conditions, if that exposure results in bodily injury during the policy period, promising:

> To pay on behalf of the Insured all sums which the Insured shall be obligated to pay by reason of the liability (i) imposed upon the Insured by law arising out of an event or a continuous or repeated exposure to conditions which result in Personal Injury or Property Damage as defined in the Underlying Insurance.
>
> . . . which occurs during the period of this Insurance, provided that in respect of this Section this Insurance is subject to the same warranties, terms and conditions (except as regards the premium, the obligation to investigate and defend, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Insurance prior to a happening for which claim is made hereunder.[10]

### 2. Continental's Policies

Continental purportedly issued two excess policies to GM.[11] These two policies covered GM from March 21, 1969, to March 21, 1970 and from March 21, 1970, to March 21, 1971.[12] The policies had $1 million limits in excess of $50

---

[10]     *See id.* Ex. 2, Royal Indemnity Co. Policy No. RLA35, at MLCDE0000197–198.

[11]     *See, e.g.,* Def. Continental Casualty Company's Brief in Supp. of its Mot. for Summary J. and Joinder in OneBeacon Ins. Co.'s Mot. for Summary J. on the Suit Limitation Clause at 2.

[12]     *Id.*

million.[13] Like OneBeacon's, Motors contends Continental's policies follow form to RLA 35, albeit through Home Insurance Company's Policy #HEC 97915 82.[14]

Continental argues Motors's only evidence is two documents: a declarations page showing Continental provided coverage in excess of the Home Insurance policy for the 1969–70 policy year, and the Home Insurance policy itself.[15] The parties' discovery regarding missing or lost policies is now complete. But the parties have agreed that they "will not be filing summary judgment motions on the existence or completeness of the Continental policies at this time."[16]

## B. GM-ROYAL MICHIGAN LITIGATION

On January 26, 2005, GM sued Royal, its longstanding primary, umbrella, and first-layer excess insurer, for Asbestos Claims coverage.[17] That lawsuit resolved in 2008, with Royal releasing hundreds of millions dollars to settle underlying lawsuits.

---

[13]  *Id.*

[14]  *Id.* at 3–4.

[15]  *Id.* at 2–3.

[16]  Letter of Carmella P. Keener to the Honorable Paul R. Wallace on behalf of Continental and Plaintiff regarding status of issues relating to the existence or completeness of Continental policies, dated May 25, 2017 (D.I. 1110).

[17]  *Gen. Motors Corp. v. Royal & Sun Alliance Ins. Grp. PLC, et al.,* 2007 WL 1206830 (Mich. Ct. App. Apr. 24, 2007). *See also* Transmittal Affidavit of Carmella P. Keener in Connection with OneBeacon Ins. Co.'s Mot. for Summ. J. on the Suit Limitation Clause Ex. 6 [hereinafter "Keener Suit Limitation Aff."].

## C. GM's Bankruptcy and Reorganization

GM went belly up in 2009. GM voluntarily filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York in June of that year.[18] As part of its reorganization, GM sold its core assets to NGMCO, Inc., and was renamed Motors Liquidation Company ("MLC").[19] GM retained all pre-1986 excess liability insurance policies.[20]

On March 29, 2011, the Bankruptcy Court issued an order (the "Bankruptcy Order") approving MLC's Second Amended Joint Chapter 11 Plan (the "Chapter 11 Plan"). The Bankruptcy Order and the Chapter 11 Plan were to distribute MLC's remaining assets. The Bankruptcy Order stated: "[a]ll of the parties' rights and arguments with respect to their rights and duties under any Insurance Policies (as hereinafter defined) are expressly preserved and are not impaired, increased, or otherwise altered by this Confirmation Order, the [Chapter 11] Plan, and the exhibits thereto."[21] "Insurance Policies" means insurance policies issued to the

---

[18]     Transmittal Affidavit of Carmella P. Keener in Connection with OneBeacon Insurance Company's Mot. for Summ. J. on the Alleged Transfer of Rights Under the OneBeacon Policies Ex. 4 [hereinafter "Keener Transfer Aff."].

[19]     Pl.'s Opp'n. & Cross-Mot. on Transfer at 4.

[20]     Aff. of Michael T. Sharkey in Support of the Trust's Opp. to Defs.'s Mots. Ex. 12. ¶ 5. [hereinafter "Sharkey Aff."].

[21]     Keener Transfer Aff. Ex. 3 (Order) ¶ 63(a).

Debtors with inception dates prior to 1986 that are included in the Asbestos Insurance Assets."[22] The Chapter 11 Plan defined "Asbestos Insurance Assets" as:

> All rights arising under liability insurance policies issued to the Debtors with inception dates prior to 1986 with respect to liability for Asbestos Claims, including, but not limited to: (i) rights (a) under insurance policies, (b) under settlement agreements made with respect to such insurance policies, (c) against the estates of insolvent insurers that issued such policies or entered into such settlements, and (d) against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers, and (ii) the right, on behalf of MLC and. its subsidiaries as of the Effective Date, to give a full release of the insurance rights of MLC and its subsidiaries as of the Effective Date under any such policy or settlement agreement with the exception of rights to coverage with respect to workers' compensation claims.[23]

On December 15, 2011, MLC formed the Motors Liquidation Company DIP Lenders Trust (again, "Motors") through a Trust Agreement (the "Trust Agreement"). Motors was established to:

> (i) avoid abandonment of certain assets of [MLC] and facilitate the recovery of certain causes of actions that will not be able to be monetized before MLC['s] dissolution as required by the [Chapter 11] Plan; and (ii) to hold and administer the assets and any corresponding liabilities of the Trust listed on Schedule A, Schedule B and Schedule C attached hereto (the "Trust Assets") for the benefit of the DIP Lenders under the DIP Credit Agreement and to distribute the Trust Assets to the DIP

---

[22] *Id.* ¶ 63(g).

[23] *Id.* Ex. 3 (Chapter 11 Plan), at § 1.7.

- 8 -

Lenders in accordance with the terms of this Agreement.[24]

Schedule B states that Motors has "[t]he right to prosecute, and receive the benefit of, all claims that [Motors] has or may have relating to the pre-1986 insurance policies that are identified on Exhibit A hereto for which Perkins Coie LLP has been retained on a contingency basis."[25]

Exhibit A is a seven-page long document detailing carrier names, policy start and end dates, policy numbers, and limits.[26] OneBeacon is not listed anywhere on Exhibit A.[27] But the Trust Agreement gave Motors authority to "[a]mend or supplement this Trust Agreement without notice to or consent of the Bankruptcy Court or any DIP Lender for the purpose of . . . curing any ambiguity, omission, inconsistency or correcting or supplementing any defective provision."[28]

Motors and GM simultaneously executed an Assignment and Assumption Agreement (the "Assignment Agreement").[29] There, GM transferred its "right,

---

[24] *See id.* Ex. 13 (Trust Agmt., Background, ¶ C).

[25] *Id.* Schedule B, ¶ 1.

[26] *See id.* Ex. 13 (Trust Agmt.), Exhibit A.

[27] *See id.*

[28] *Id.* § 11.13(a)(x).

[29] *See id.* Ex. 15 (Assignment Agmt.).

- 9 -

title and interest in and to the assets (including claims against third parties) set forth and described on <u>Schedule A</u> hereto[.]"[30]

Schedule A to the Assignment Agreement states that Motors has "the right to prosecute, and receive the benefit of, all claims that [Motors] has or may have relating to the pre-1986 insurance policies that are identified on Exhibit A hereto for which Perkins Coie LLP has been retained on a contingency basis."[31] However, there is no Exhibit A to the Assignment Agreement. Instead, there is a one-page document entitled "Annex A." Annex A simply says "Pre-1986 Insurance Policies[.]"[32]

Motors filed its initial suit on December 1, 2011. On January 31, 2012, Motors amended its complaint to include OneBeacon. On February 29, 2012, using its authority to cure any ambiguity, Motors amended Section B of the Trust Agreement to include language capturing OneBeacon.[33] Specifically, the amendment stated:

> The right to prosecute, and receive the benefit of, all claims that [Motors] has or may have relating to all excess liability insurance policies incepting before 1986

---

[30]     *Id.* at § 1.1(b). (emphasis in original).

[31]     *Id.* at Schedule A, ¶ 1. Schedule A of the Assignment Agreement and Schedule B of the Trust Agreement state the same thing.

[32]     Keener Transfer Aff. Ex. 15 (Assignment Agmt., Annex A).

[33]     *Id.* Ex. 16 (Feb. 29, 2012, Trust Amendment Letter from AP Services, LLC, Motors's Trustee).

including, without limitation, the pre-1986 insurance policies that are identified on Exhibit A hereto for which Perkins Coie LLP has been retained on a contingency basis.[34]

## III.   STANDARD OF REVIEW

This Court cannot grant either party's motion for summary judgment under Delaware Superior Court Civil Rule 56 "unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[35] Summary judgment will not be granted if there is a material fact in dispute or if "it seems desirable to inquire thoroughly into [the facts] to clarify the application of the law to the circumstances."[36] The moving party has the burden of showing that there is no genuine issue of material fact.[37] If that burden is met, the non-moving party must demonstrate that "there is a genuine issue for trial."[38] And in

---

[34]     *Id.*

[35]     Del. Super. Ct. Civ. R. 56; *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997) (citing *Playtex FP, Inc. v. Columbia Cas. Co.*, 622 A.2d 1074, 1076 (Del. Super. Ct. 1992)).

[36]     *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).

[37]     *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[38]     Del. Super. Ct. Civ. R. 56(e); *see also Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979) ("If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight.").

determining whether there is, the Court must view the facts in the light most favorable to the non-moving party.[39]

Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[40] But where cross-motions for summary judgment are filed and an issue of material fact exists, summary judgment is not appropriate.[41] In its evaluation of whether there is a genuine issue of material fact, the Court should evaluate each motion independently.[42] Where it seems prudent to make a more thorough inquiry into the facts, summary judgment is inappropriate.[43]

## IV. DISCUSSION

### A. TRANSFER OF RIGHTS

OneBeacon filed a motion for summary judgment alleging that Motors Liquidation Company (again, "MLC") did not transfer its rights under the

---

[39] *Tanzer*, 402 A.2d at 385 (citing *Judah v. Del. Trust Co.*, 387 A.2d 624, 632 (Del. Super. Ct. 1977)).

[40] Del. Super. Ct. Civ. R. 56(h).

[41] *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008).

[42] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 167 (Del. Ch. 2003).

[43] *Pathmark Stores, Inc. v. 3821 Associates, L.P.*, 663 A.2d 1189, 1191 (Del. Ch. 1995) ("[S]ummary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

OneBeacon insurance policies to Motors Liquidation Company DIP Lenders Trust (again, the Trust is referred to herein as "Motors"). Motors contends that it was "assigned the rights to prosecute, and receive the benefit of, whatever rights [MLC] had against OneBeacon" as of December 15, 2011.[44] The Court finds that the rights under the OneBeacon policies were property assigned to Motors. The Court **GRANTS** Plaintiff Motors Liquidation Company DIP Lender's Trust's Cross-Motion for Summary Judgment on Transfer of Rights, and **DENIES** Defendant OneBeacon's Motion for Summary Judgment on Transfer of Rights

### 1. The GM Bankruptcy

On June 1, 2009, GM filed for Chapter 11 bankruptcy in the Southern District of New York.[45] As a part of this Chapter 11, GM sold its assets to New GM, and GM was renamed Motors Liquidation Company (again, "MLC").[46] All pre-1986 insurance policies were not included in this initial transfer to New GM and remained held by GM.[47] On March 29, 2011, the bankruptcy court approved MLC's amended Chapter 11 Plan. This amended Plan required that MLC's rights

---

[44] Pl.'s Opp'n. to Def.'s Mot. for Summ. J. on Transfer of Rights & Cross-Mot. for Summ. J. on Transfer of Rights, at 1 [hereinafter "Pl.'s Opp. & Cross-Mot. on Transfer."].

[45] *Id.* at 4.

[46] *Id.*

[47] *Id.* at 5; Sharkey Aff. Ex. 12 (Stip. of Settlement Re: Master Sale & Purchase Agmt. ¶ 5).

under any pre-1986 insurance policies also be transferred to Motors.[48] OneBeacon was not excluded from this transfer.

## 2. MLC Creates the Motors Trust and Transfers All Assets to It.

On December 15, 2011, MLC formed Motors to avoid abandonment of assets held by MLC and to hold and administer the assets in a manner to benefit the DIP Lenders via the Trust Agreement.[49] The Trust Agreement stated "[e]ffective upon the Transfer Date, [MLC] hereby transfers to the Trust, in furtherance of the [amended Chapter 11 Plan], the Trust Assets free and clear . . . ."[50] The Trust Agreement defines Trust Assets as "the assets and any corresponding liabilities of the Trust listed on Schedule A, Schedule B, and Schedule C attached hereto."[51] Schedule B listed "[t]he right to prosecute, and receive the benefit of, all claims that [MLC] has or may have relating to the pre-1986 insurance policies that are identified on Exhibit A hereto. . . ."[52] Exhibit A did not include the OneBeacon policies. But the Trust was additionally

---

[48] Pl.'s Opp. & Cross-Mot. on Transfer at 5. The Order confirming the amended Chapter 11 Plan defined these insurance policies as "insurance policies issued to the Debtors with inception dates prior to 1986 that are included in the Asbestos Insurance Assets." Keener Transfer Aff. Ex. 3 (Order ¶ 63(g)). Asbestos insurance claims means "*all* rights arising under liability insurance policies issued to the Debtors with inception dates prior to 1986 with respect to liability for Asbestos Claims . . . ." *Id.* Ex. 3 (Chapter 11 Plan § 1.7).

[49] Pl.'s Opp. & Cross-Mot. on Transfer at 7.

[50] Keener Transfer Aff. Ex. 13 (Trust Agmt. § 2.3).

[51] *Id.* Ex. 13 (Trust Agmt. § 1.1(gg) & Background ¶ C).

[52] *Id.* Ex. 13 (Trust Agmt. Ex. A).

authorized to hold "all other property held from time to time."[53] And the Trust Administrator could "amend or supplement [the] Trust Agreement . . . for the purpose of . . . curing any ambiguity, omission, inconsistency or correcting or supplementing any defective provision. . . ."[54]

After MLC created Motors, it executed the separate Assignment Agreement to transfer and assign assets to Motors. In that document, MLC "absolutely and unconditionally transfer[red], assign[ed], and deliver[ed] unto [Motors] all of [MLC's] rights, title, and interest in and to . . . the assets (including claims against third parties) set forth and described on Schedule A hereto."[55] Schedule A lists "[t]he right to prosecute, and receive the benefit of, all claims that [MLC] has or may have relating to the pre-1986 insurance policies that are identified on Exhibit A hereto . . . ."[56] While there is no Exhibit A, there is an Annex A. Annex A lists "Pre-1986 Insurance Policies."[57] OneBeacon policies are not carved out.

On February 29, 2012, the Trust Administrator effectively amended Exhibit B of the Trust Agreement to read "[t]he right to prosecute and receive the benefit

---

[53]    *Id.* Ex. 13 (Trust Agmt. § 2.3).

[54]    *Id.* Ex. 13 (Trust Agmt. § 11.13(a)(x)).

[55]    *Id.* Ex. 15 (Assignment § 1.1(b)). That document further stated that the Trust "hereby accepts such transfer, assignment, and delivery of the Assigned Assets . . . ." *Id.* at § 1.2.

[56]    *Id.* Ex. 15 (Schedule A, Item 1).

[57]    *Id.* Ex. 15 (Annex A).

of, all claims that [MLC] has or may have relating to all excess liability insurance policies incepting before 1986 including, without limitation, the pre-1986 insurance policies that are identified on Exhibit A hereto . . . ."[58] It is undisputed that OneBeacon is a pre-1986 insurance policy.

### 3. The Plain Language of the Assignment Agreement Shows MLC Successfully Transferred All Rights Under the Pre-1986 Insurance Policies to Motors, Including the OneBeacon Policies.

OneBeacon contends that the omission of its name from the schedule of insurance policies means that MLC excluded them from the transfer to Motors. Not so. The Trust Agreement created Motors, but the actual transfer of assets to Motors occurred via the Assignment Agreement.[59] Exhibit A to (Schedule A of) the Trust Assignment does not exist, but there is an Annex A that lists the information purported to be in "Exhibit A." Annex A lists "Pre-1986 Insurance Policies" as assets to be transferred to Motors. "[T]he plain language of an assignment determines its breadth and scope."[60] Here, the plain language of Annex

---

[58]    *Id.* Ex. 16 (Feb. 29, 2012, Trust Amendment Letter from AP Services, LLC, Motors's Trustee).

[59]    *Bank of Am. Nat'l Trust & Sav. Ass'n v. Private Trust Corp.*, 1998 WL 230991, at *4 (S.D.N.Y. May 6, 1998) ("And because it is the Assignment Agreement through which the parties effected the sale of the Obligation, and not the Trust Agreement, the former agreement *must* relate to this action, whether or not the latter does as well."). Section 2.2 of the Assignment Agreement states "[T]his Agreement shall be construed and enforced in accordance with, and the rights and obligations of the parties hereunder shall be governed by, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof." *See* Keener Transfer Aff. Ex. 15 (Assignment Agmt. § 2.2).

[60]    *Najjar Grp., LLC v. W. 56th Hotel LLC*, 106 A.D.3d 640, 641 (N.Y. 2013) (internal citations omitted).

- 16 -

A transferred *all* "Pre-1986 Insurance Policies." OneBeacon policies were in effect from November 1, 1969, to March 21, 1972—they are, therefore, pre-1986 policies.

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[61] "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[62] The clear, unambiguous language of the Assignment Agreement transfers all "Pre-1986 Insurance Policies" from MLC to Motors. No doubt, OneBeacon's is a pre-1986 insurance policy. Accordingly, Motors assumed all rights to prosecute and receive the benefits of the OneBeacon insurance policies.

### 4. Omission of OneBeacon from the Initial Trust Agreement Does Not Preclude Transfer to Motors.

Neither Motors nor OneBeacon dispute that OneBeacon was not listed in Exhibit A (aka Annex A) of (Schedule A) of the initial Trust Agreement.[63] But, the Trust Administrator amended the Trust Agreement, as he was empowered to do, by including "all excess liability insurance policies incepting before 1986

---

[61] *Greenfield v. Phillies Records, Inc.*, 780 N.E.2d 565, 569 (N.Y. Ct. App. 2002) (citations omitted).

[62] *Id.* at 569–70 (internal citations omitted).

[63] Pl.'s Opp. & Cross-Mot. on Transfer at 17.

including, without limitation, the pre-1986 insurance policies that are identified on Exhibit A hereto . . . ."[64] OneBeacon was not initially on Exhibit A as MLC was precluded from suing OneBeacon pursuant to a Standstill Agreement. Exhibit A of the original complaint in this action became the basis for Exhibit A of the Trust Agreement. When that Standstill Agreement expired on January 17, 2012, Motors added OneBeacon to the Complaint. Upon realizing the unintentional omission, the Trust Administrator amended the Trust Agreement so as to include the OneBeacon policies.

OneBeacon claims that the Motors's initial omission of OneBeacon serves as an intentional waiver of its rights. It was not. Intent to abandon rights must be clear.[65] There is no evidence that MLC expressly chose to abandon its rights under the OneBeacon policies while it clearly sought to exercise its rights under all others. Further, the rights under the OneBeacon policies had already been transferred to Motors via the valid Assignment Agreement. The amendment by the Trust Administrator only served to "[cure] any ambiguity, omission, [or] inconsistency"[66] in the Trust Agreement.

---

[64] *See* Keener Transfer Aff. Ex. 16 (Feb. 29, 2012, Trust Amendment Letter from AP Services, LLC, Motors's Trustee); *see also id.* Ex. 13 (Trust Agmt. § 11.13(a)(x)).

[65] *See In re Sire Plan*, 100 B.R. 690, 693 (Bankr. S.D.N.Y. 1989).

[66] *See* Keener Transfer Aff. Ex. 13 (Trust Agmt. § 11.13(a)(x)).

As such, MLC did validly and completely transfer all of its rights under the OneBeacon policies to Motors. Plaintiff Motors Liquidation Company DIP Lender's Trust's Cross-Motion for Summary Judgment on Transfer of Rights is **GRANTED**. Defendant OneBeacon's Motion for Summary Judgment on Transfer of Rights is **DENIED**.

## B. TRIGGERING ONEBEACON AND CONTINENTAL'S POLICIES

### 1. RTP 06000 Must Be Triggered for OneBeacon to be Liable

Under Michigan law, courts "employ the plain language of the contract."[67] Therefore, "unambiguous contracts are not open to judicial construction and must be *enforced as written*."[68] Defendants assert that enforcement "as written" requires this Court to find that after December 31, 1971 "occurrence-based" coverage under

---

[67] *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) ("In failing to employ the plain language of the contract, the . . . Court erred."). The Court finds that the policies must be interpreted under Michigan law. Delaware utilizes Restatement (Second) of Conflicts of Law § 188's "most significant relationship test" to determine appropriate choice of law. *Liggett Group, Inc. v. Affiliated FM Insur. Co.*, 788 A.2d 134, 137 (Del. Super. Ct. 2001). "The most significant factor of conflicts of law analysis in a complex insurance case with multiple insurers and multiple risks is the principal place of business of the insured because it is the 'situs which link[s] all the parties together.'" *Id.* (quoting *Monsanto Co. v. Aetna Cas. and Sur. Co.*, 1991 WL 236936, at *3 (Del. Super. Ct. Oct. 29, 1991). The Royal policies, to which OneBeacon and Continental follow form, were issued to GM, a company headquartered in Michigan. *See* Keener Trigger Aff. Ex. 91 (Motors's Responses and Objections to OneBeacon's First Set of Requests for Admission), at ¶¶ 1–4; *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, --- A.3d ----, 2017, WL 1090544, at *7 (Del. Mar. 23, 2017) ("In [analyzing] a contract dispute [under § 188 of the Restatement (Second) of Conflicts of Law], where parties seek a decision about their mutual obligations under the contract, the appropriate time period to consider is the time at which the contract was formed. . . .This approach is also supported by general principles employed in contract interpretation.") (citations omitted).So Michigan law controls.

[68] *Rory,* 703 N.W.2d at 30 ("A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*.") (emphasis in original).

- 19 -

RTP 06000 was no longer available, because Endorsement 15 converted it to "occurrence-reported" coverage.[69] They argue that because none of the claims at issue in this case were reported prior to Endorsement 15 taking effect, none of the claims trigger RTP 06000.[70]

Motors counters by asserting that the Michigan Court of Appeals already decided this precise issue regarding coverage under Endorsement 15. Motors claims that Court did so in its decision regarding Royal's coverage.[71] Motors argues that Defendants attempt to "improperly expand Judge Silverman's [2015] ruling" when they say the reporting dates of the claims at issue preclude coverage.[72]

It is true that RTP 06000 changed via Endorsement 15 on December 31, 1971.[73] The language "[t]his policy applies worldwide, only to occurrences during the policy period"[74] was changed to "this policy applies worldwide, only to

---

[69]   OneBeacon Ins. Co. Mot. for Summary J. on Trigger, at 9, 24 [hereinafter "OneBeacon Mot. on Trigger"].

[70]   *Id.* at 23.

[71]   *See Gen. Motors Corp. v. Royal & Sun Alliance Ins. Grp. PLC, et al.*, 2007 WL 1206830 (Mich. Ct. App. Apr. 24, 2007).

[72]   *See generally Motors II*, 2015 WL 10376123 (Del. Super. Ct. Nov. 25, 2015).

[73]   Transmittal Aff. of Carmella P. Keener in Connection with OneBeacon Insurance Company's Mot. for Summ. J. on Trigger Ex. 6 at MLC DE 0000078 [hereinafter "Keener Trigger Aff."].

[74]   *Id.* Ex. 6 at MLC DE 0000004.

occurrences *which are reported* . . . during the policy period."[75] This language in Endorsement 15 took effect on December 31, 1971, at 12:01am.[76] No retroactive date was included in the change.[77]

Because of this change in language, Defendants argue that: (1) Endorsement 15 deems the date of the report to be the date of the occurrence; and (2) RTP 06000 covered all occurrences reported during its effective dates, even if the occurrence itself took place outside of those dates.[78] Essentially, Defendants assert that because the claims at issue are not covered by RTP 06000, the claims do not trigger the upper-level insurance that OneBeacon and Continental provided.

The OneBeacon policies "shall pay in respect of any one loss, whether under Section A of the Insuring Clause, or under Section B of the Insuring Clause, or under both sections combined, the excess of: . . . [t]he ultimate net loss amount covered under the Underlying Insurances as per Schedule."[79] Motors must show that RTP 06000 was, in fact, triggered by the claims in order to prevail here. There is no dispute by either party that the asbestos claims at issue now were reported

---

[75]     *Id.* Ex. 6 at MLC DE 0000078 (emphasis added).

[76]     *Id.*

[77]     OneBeacon Mot. on Trigger at 26.

[78]     *Id.*

[79]     Keener Trigger Aff. Ex. 7 at MLC DE0000198.

long after RTP 06000 expired.[80]  Further, Motors cannot leapfrog over the primary level of insurance to get to the Defendants' upper-level insurance.  In order to hold OneBeacon and Continental liable, two requirements must be met: first, that RTP 06000 be triggered, and second, that the amount at stake is enough to trigger the OneBeacon and Continental policies.

## 2. The Michigan Litigation

Motors contends that OneBeacon and Continental are trying to re-litigate the trigger issue, which, Motors says, was already decided by the Michigan courts.  In *General Motors v. Royal & Sun Alliance*,[81] the Michigan Court of Appeals found that the unambiguous language of Endorsement 15 did not impact GM's pre-1972 Royal coverage and that "occurrence-based" coverage remained available for GM's claims after 1972.[82]  In that case, Royal (an insurer) relied on the same arguments and documentation that OneBeacon and Continental relies upon here.  Royal argued that it could refuse coverage of GM's asbestos-related claims because "the change in the type of policy coverage in 1972, [which] altered the

---

[80]     *See* OneBeacon Mot. on Trigger at 33 ("The salient and undisputed fact is that no claim *at issue* was made against or reported to Old-GM, much less Royal, while a Royal policy was on-risk at to that claim.") (emphasis in original).

[81]     2007 WL 1206830 (Mich. Ct. App. Apr. 24, 2007).

[82]     *Id.* at *4.

nature of the agreement and coverage was no longer available for that time period."[83]

The court of appeals found that "[a]lthough the [Royal] policy coverage was altered in 1972, Endorsement 15 provided that the policy was amended effective December 31, 1971, and the endorsement fails to delineate any change to prior policies that were in effect."[84] Further, that court held that Royal's pre-1972 "occurrence-based" coverage remained intact after 1972, and Royal's duty to defend under the pre-1972 coverage was triggered by GM's asbestos claims.[85] Most importantly here, Endorsement 15 did not retroactively convert the parties' "occurrence-based" coverage to "occurrence-reported."[86] Because the pre-1972 underlying Royal coverage was triggered, and the change in trigger was not retroactive to prior to December 31, 1971, Judge Silverman's 2015 decision does not apply to GM's pre-1972 excess coverage.[87]

---

[83]    *Id.* at *2.

[84]    *Id.* at *4 ("[P]laintiff has submitted complaints wherein it was named as a party responsible for asbestos exposure to individuals during the policy period in question, specifically between 1954 to 1971. Although the policy coverage was altered in 1972, Endorsement 15 provided that the policy was amended effective December 31, 1971, and the endorsement fails to delineate any change to prior policies that were in effect. . . . The plain language of the policy at issue invokes the broad duty to defend.")

[85]    *Id.* at *4.

[86]    *Id.*

[87]    *Motors II*, 2015 WL 10376123, at *4 ("[T]he decision here flows from the court's holding as a matter of law that barring exceptional circumstances or policy language not present

- 23 -

### 3. Endorsement 15 Does Not Change RTP 06000 Coverage Prior to 1972 from "Occurrence-Based" to "Occurrence-Reported."

The arguments that OneBeacon and Continental make in their present motions are identical to Royal's in the prior Michigan action regarding the application of Endorsement 15. This Court, too, finds that Endorsement 15 does not preclude or obviate the trigger of coverage under RTP 06000 for OneBeacon and Continental.

The Court previously examined Endorsement 15 in the context of post-1971 policies.[88] Many of the insurers argued that Endorsement 15 changed the underlying policies to "occurrence-reported" rather than "occurrence-based." And so, they said, Motors could not aggregate to trigger the excess insurance policies. But that prior decision resolving those arguments did not discuss the effect on the pre-1972 policies – the policies at issue here.

The Michigan Court of Appeals found the underlying Royal policies to be "occurrence-based."[89] OneBeacon and Continental contend this finding does not

---

here, higher level excess insurance policies do not respond if the primary and first-level excess policies have not been triggered.") Judge Silverman's decision addressed the trigger of coverage regarding post-1971 policies only. He found that post-1971 Royal insurance coverage responded only to "occurrences-reported" during the policy period and excess coverage could not be triggered if underlying coverage was not triggered.

[88] *Motors II*, 2015 WL 10376123, at *4.

[89] *Royal*, 2007 WL 1206830, at *4.

bind them, as they were not parties to that litigation.[90] But that decision did affect a lower level of coverage beneath OneBeacon and Continental. That decision was based upon the same language of the same Endorsement 15 that OneBeacon relies upon in its instant motion. And the Court finds that decision is now dispositive of OneBeacon and Continental's instant argument; it was and is binding with respect to GM and Royal's relationship, and it was never altered on reargument.

RTP 06000 was triggered by the claims at issue here. Those claims, in turn, triggered Royal's coverage. And they now trigger OneBeacon and Continental's.

Even if this Court were to find the Michigan decision non-binding, the rules of construction employed in *Royal* do not change.[91] That is to say, "[a]n insurance policy must be enforced according to its terms," "[t]he goal of contract construction is to determine and enforce the parties' intent based on the plain language of the contract itself," and "[w]hen the language of the contract is clear and unambiguous, its construction presents a question of law for the trial court."[92]

In looking at the language of Endorsement 15, this Court is in accord with the Michigan Court of Appeals. The plain language of Endorsement 15 "fails to

---

[90]     Rep. Br. in Further Supp. of Def. OneBeacon Insurance Company's Mot. for Summ. J. on Trigger and in Opp'n. to Pl.'s Mot. for Partial Summ. J. on Trigger at 6. *See also* Def. Continental Casualty Company's Joinder in OneBeacon Insurance Company's Rep. Br. in Further Supp. of Mot. for Summ. J. on Trigger and in Opp'n. to Pl.'s Mot. for Partial Summ. J. on Trigger at 1.

[91]     *Royal*, 2007 WL 1206830, at *2–3.

[92]     *Id.*

delineate any change to prior policies that were in effect."[93]  Endorsement 15 went into effect at 12:01 AM on December 31, 1971, and altered no policy in effect prior to that time.  OneBeacon and Continental's "occurrence-based" policies were in effect prior to December 31, 1971.  And those policies were not converted to "occurrence-reported" under Endorsement 15's plain language.

Plaintiff Motors Liquidation Company DIP Lender's Trust's Cross-Motion for Summary Judgment on Trigger is **GRANTED**.  Defendants OneBeacon and Continental's Motions for Summary Judgment on Trigger are **DENIED**.

## C. SUIT LIMITATIONS

OneBeacon and Continental argue that the Suit Limitations Clause incorporated into the Royal policies precludes Motors from bringing this suit because it is time barred.  Motors contends that the suit is not time barred, because the Suit Limitations Clause only applies to first-party coverage, not the third-party liability insurance here.  The Court finds that this suit is not precluded by RLA35's Suit Limitations Clause, and **DENIES** OneBeacon and Continental's Motion for Summary Judgment on Suit Limitations.

### 1. The Background and Structure of OneBeacon's and Continental's Policies

Between November 1, 1969 and March 21, 1972, OneBeacon sold three excess insurance policies to GM.  GM properly transferred the rights to these

---

[93]      *Id.* at *4.

policies through its Chapter 11 Plan.[94] OneBeacon's policies follow form to the excess policies and incorporate by reference most of the terms of the RLA35 umbrella policy.[95] It does so, stating their policies are, "[e]xcept as herein provided, subject to all the terms and conditions of Policy No. RLA35 issued by Royal Indemnity Insurance Company."[96]

Continental's policies' purportedly follow form to Home #HEC 97915 82, which follows form to RLA35 "except as provided otherwise herein."[97]

RLA35 is a package policy that provides both first- and third-party coverage. First-party coverage is that which responds to any harm the insured itself suffers. Third-party coverage is liability coverage that covers claims made by others against the insured. Section A of RLA35 pertains to the first-party insurance coverage, while Section B pertains to the third-party insurance coverage.[98] It is this third-party coverage that responds when an injured third party alleges liability against GM for bodily injury or property damage – like suits against Old GM for asbestos damage.

---

[94]    See Section IV.A (Transfer of Rights), *supra.*

[95]    Transmittal Aff. of Carmella P. Keener in Connection with OneBeacon Insurance Company's Mot. for Summ. J. on the Suit Limitations Clause Ex. 1 at MLC DE 0000243; MLC DE 0000280; MLC DE 0000336 [hereinafter "Keener Suit Limitations Aff."].

[96]    *Id.*

[97]    Sharkey Aff. Ex. 4 at MLC DE 0000254

[98]    *Id.* Ex. 2 at MLC DE 0000197

Because RLA35 includes both first-party and third-party coverage, there are terms and clauses in the policy that pertain to one, the other, or both. Some of these terms and clauses are typically found only in one type, while others would not make sense if applied to that type. One of the terms used in both is "loss."

"Loss" is used in different contexts throughout RLA35. "Loss" can mean the physical event that takes place during the policy period, causing first-party coverage to respond.[99] "Loss" can also mean that amount of payment made for a covered event under the policy–not the event itself.[100] This is the meaning of "loss" in the third-party liability coverage context.

Here, the meaning of the term "loss" in the Suit Limitations Clause within RLA35's Notice of Loss clause is critical. This is the clause, OneBeacon and Continental say, that bars Motors's suit. The Suit Limitations Clause states: "[n]o suit to recover on account of loss under this policy shall be brought before the expiration of two months from the filing of proof as aforesaid on account of such loss, nor after the expiration of thirty-six months from the discovery of the aforesaid loss or occurrence."[101] The general and products liability policies under

---

[99]    Keener Suit Limitations Aff Ex. 2 at MLC DE 0000197

[100]    *Id.* at MLC DE 0000199.

[101]    *Id.* at MLC DE 0000202

RLA35 – those which would provide third-party coverage – do not contain this Suit Limitations Clause.[102]

## 2. RLA35 is Ambiguous as Written and Must Be Interpreted According to Its Context.

Interpreting contract language is a question of law.[103] Normally a term in a contract is used uniformly throughout the document. However, when it is clear from the context that the term has obviously different meanings throughout the contract and these cannot be reconciled, this rule does not apply.[104] Contracts should be read as a whole.[105] But, when reading the document as a whole results in a term being used in clearly different ways, those several different (but reasonable and sensible) meanings must control.[106]

---

[102]  *See* Keener Trigger Aff. Ex 6. *See also* Sharkey Aff. Ex 1.

[103]  *See, e.g., City of Grosse Pointe Park v. Michigan Municipal Liability and Property Pool,* 702 N.W.2d 106, 113 (Mich. 2005) ("If the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning[']") (citation omitted); *see also E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* 711 A.2d 45, 56 (Del. Super. 1995).

[104]  *See DaimlerChrysler Corp. v. G Tech Professional Staffing, Inc.,* 678 N.W.2d 647, 649 (Mich. Ct. App. 2003) ("[P]arties may, of course, specifically assign a different meaning to the words used in a contract. And the circumstances may clearly indicate a word used in a contract has a meaning contrary to its ordinary usage.") (citations omitted); *Radio Corp. of America v. Philadelphia Storage Battery Co.,* 6 A.2d 329, 334 (Del. 1939) ("[W]ords used in one sense in one part of the contract will ordinarily be considered to have been used in the same sense in another part where the contrary is not indicated."); *See also Md. Cas. Co. v. W.R. Grace & Co.,* 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document, especially terms of art, normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended.").

[105]  *Allstate Ins. Co. v. Tomaszewski,* 447 N.W.2d 849, 851 (Mich. Ct. App. 1989).

[106]  *See DaimlerChrysler Corp.,* 678 N.W.2d at 649.

"Under Michigan law, 'contracts must be construed consistent with common sense and in a manner that avoids absurd results.'"[107] "A contract is ambiguous 'if its words may reasonably be understood in different ways.'"[108] "In other words, a 'contract is ambiguous when its provisions are capable of conflicting interpretations.'"[109] In insurance policies, any such ambiguity is "construed liberally in favor of the insured and strictly against the insurer, because an insurer has a duty to express clearly the limitations in its policy."[110] This is settled law in Michigan.[111]

When looking to standard practice in the insurance industry, it is almost impossible to find third-party liability coverage that contains a suit limitations provision.[112] Suit limitations clauses are common features of first-party policies,

---

[107] *Wernimont v. Prudential Life Ins. Co.*, 2015 WL 328603, at *4 (W.D. Mich. Jan. 26, 1969) (citing *Certified Restoration Dry Cleaning v. Tenke Corp.*, 511 F.3d 535, 545 (6th Cir. 2007) (quoting *Kellogg Co. v. Sabhlok*, 471 F.3d 629, 636 (6th Cir. 2006))).

[108] *Wernimont*, 2015 WL 328603, at *4 (citing *Certified Restoration Dry Cleaning*, 511 F.3d, at 544 (quoting *UAW–GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998)).

[109] *Wernimont*, 2015 WL 328603, at *4 (internal citations and quotations omitted).

[110] *Id.* (internal citations and quotations omitted).

[111] *See, e.g.*, *Group Ins. Co. of Mich. v. Czopek*, 489 N.W.2d 444, 447 (Mich. 1992) ("Further, the exclusions to the general liability in a policy of insurance are to be strictly construed against the insurer.") (citing *Francis v. Scheper*, 40 N.W.2d 214 (Mich. 1949)) (followed by *Hunt v. Drielick*, 852 N.W.2d 562, 565-66 (Mich. 2014)).

[112] *See, e.g.*, *Durant Const. Inc. v. Gourley*, 336 N.W.2d 856, 859 (Mich. Ct. App. 1983) ("Evidence of custom and usage of a trade is admissible to explain ambiguous language in a contract.").

but not third party liability policies.[113] "Many first-party insurance policies, often pursuant to statute, contain provisions stating that no suit on the policy is sustainable unless commenced within a certain number of months after the loss."[114] And "[b]ecause the time of loss is more readily ascertainable in first party losses, it is easier to determine when the suit limitations period begins to run."[115] Why is this practice of import here? Because the Suit Limitations Clause falls within RLA35's Notice of Loss clause. It is tied to a "proof-of-loss" requirement – something found more typically in first-party than third-party coverage.

### 3. RLA 35 Does Not Bar Motors's Suit Because "Loss" Does Not Have a Uniform Meaning and Must be Read in Context and According to Industry Standards.

As noted before, RLA35 is a package policy that provided GM with both first- and third-party liability insurance. Because of its dual nature, certain parts of the policy apply to first-party coverage; others apply to third-party coverage. And the use of the term "loss" appears in each.

The Suit Limitations Clause at issue is found within the Notice of Loss clause. Again, it states that "[n]o suit to recover on account of loss under this policy shall be brought before the expiration of two months from the filing of proof

---

[113]    3-20 *New Appleman on Insurance* § 20.03(1).

[114]    Alan D. Windt, *2 Ins. Claims and Disputes* § 9.3 (6th ed.).

[115]    John H. Mathias, John D. Shugrue, and Thomas A Marrinson, *Insurance Coverage Disputes* § 2.02[5] (2002).

as aforesaid on account of such loss, nor after the expiration of thirty-six months from the discovery of the aforesaid loss or occurrence."[116] So what's the meaning of "loss" in the context of this provision?

The term "loss" appears in two different insuring clauses. In Insuring Clause A, pertaining to first-party property coverage, it states that the policy "cover[s] all loss occurring during the period of this insurance, resulting from physical loss or damage to all property of every description."[117] It does not appear in Insuring Clause B, pertaining to third-party liability coverage. Motors contends that this difference is present because the Suit Limitations Clause referring to "loss" only applies to first-party property coverage, not third-party liability coverage. The Court agrees.

OneBeacon argues that the term "loss" should also apply to this third-party liability coverage because even though the term "loss" only appears in the first-party insuring clause A, it is used elsewhere in RLA35 in a context that refers to both first- and third-party coverage. Maybe so. But while it is true that "loss" is used throughout RLA35, its different meanings therein depend on the context of the particular part of the document in which it is found.

---

[116]    Keener Suit Limitations Aff. Ex. 2 at MLC DE 0000202

[117]    *Id.* at MLC DE 0000197.

The several meanings of the term "loss" in RLA35 can only make sense if the term is read on each occasion in context. For instance, as to its use singularly for first-party property coverage, one of RLA35's clauses speaks to other insurance that exists "at the time of the happening of any loss which would, but for the existence of this insurance, insure such loss."[118] RLA35's subrogation provision releases liability given by the insured party "prior to loss."[119]

But as to third-party liability coverage, one singularly applicable term is "ultimate net loss." That phrase is defined in the context of third-party coverage as "the amount payable in settlement of the liability of the Insured after making deductions for all recoveries and for other valid and collectively insurances . . . ."[120] For first-party coverage, it is defined to mean "the total sum actually paid in final settlement of any claim after making deductions for all recoveries and for other valuable and collectible insurance . . . ."[121] Another one of RLA35's provisions bars coverage for "that part of any loss represented by any deductible or self-insured amount" under a policy.[122] This clearly refers to an amount paid out, not the event causing the insurance to pay.

---

[118]    *Id.* at MLC DE 0000200.

[119]    *Id.* at MLC DE 0000203.

[120]    *Id.* at MLC DE 0000199.

[121]    *Id.*

These few examples illustrate that "loss" has different meanings throughout RLA35. And the meaning in each instance depends on the context in which it is used. In the clauses where "loss" refers to the event itself, it clearly cannot mean an amount paid. Conversely, in the clauses were "loss" refers to the amount paid, it cannot mean the event.

### 4. Reading the Suit Limitations Clause to Apply to Third-Party Liability Coverage Would Produce Absurd Results.

Here, the Suit Limitations Clause referring to "loss" is tied to a "proof of loss" requirement – something that does not exist in the industry for third-party liability coverage. That is why the term "loss" in that provision must be read as applying to first-party property coverage, not third-party liability coverage.

The Notice of Loss clause states that "[n]o suit to recover on account of loss under this policy shall be brought after the expiration of thirty-six months from the discovery of the aforesaid loss or occurrence." For this to apply to a "loss" in the context of third-party liability coverage, Motors had to know not only that some third party suffered damage that would trigger OneBeacon's coverage, but also file a suit with OneBeacon for coverage for any sums Motors paid out within thirty-six months of that third party's damage. Many states have statutes of limitations that

---

[122]    *Id.* at MLC DE 0000202.

allow a suit to be filed more than thirty-six months after the damage takes place.[123]

If someone in one of those states was injured by a defect in a GM vehicle, and did not bring the suit until thirty-seven months after the injury, Motors would not have known of the suit and would not have known whether it triggered OneBeacon and Continental's coverage layer within the thirty-six months required.

Michigan law prohibits insurance policy provisions that have unattainable conditions allowing the right to file a suit to expire before it accrues.[124] If a contract has a provision that cannot be met, then it cannot stand. Here, having the Suit Limitations Clause apply to third-party liability claims could require something that is impossible for Motors to do. As such, the Suit Limitations Clause must apply only to first-party property claims, not the third-party liability claims at issue here. Accordingly, OneBeacon and Continental's Motions for Summary Judgment based upon the Suit Limitations Clause are **DENIED**.

---

[123] *See, e.g.,* ME. REV. STAT. ANN. tit. 14, § 752 (six years in Maine); MO. REV. STAT. § 516.120 (five years in Missouri); NEV. REV. STAT. § 11.190 (four years in Nevada); WYO. STAT. ANN. § 1-3-105(a)(iv)(C) (four years in Wyoming).

[124] *See* M.L.C.A. § 500.2254 ("No article, bylaw, resolution or policy provision adopted by any life, disability, surety, or casualty insurance company doing business in this state prohibiting a member or beneficiary from commencing and maintaining suits at law or in equity against such company shall be valid and no such article, bylaw, provision or resolution shall hereafter be a bar to any suit in any court in this state."); *Klida v. Braman,* 748 N.W.2d 244, 252 (Mich. Ct. App. 2007) ("We are also cognizant of the well-established tenet that '[c]ourts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract.' But contracts may not grant a right and then burden that right with a condition that cannot be met.") (internal citation omitted).

- 35 -

## D. NUMBER OF OCCURRENCES

Motors alleges that this Court's prior decisions make the "cause test" the law of the case. There, Motors contends, this Court found that when a company makes a product which causes an injury or systemic injuries, there is only one occurrence. Essentially, all 80,000 outstanding asbestos claims funnel back to one occurrence: when the injurious products were manufactured.

OneBeacon argues that each claim is distinct. Claimants were exposed to at least a dozen different types of asbestos-containing products, suffered exposure at different locations, and were all exposed to asbestos on different start and end dates.[125] OneBeacon points out also that GM and Royal treated each asbestos claim as a separate occurrence during the parties' relationship.[126] And so, OneBeacon says, Motors must take on GM's prior practice, GM's previous arguments thereon, and is estopped from now arguing to the contrary.[127]

To forward its contention, each side cites to several supporting cases.

---

[125]  Br. in Supp. of Def. OneBeacon Insurance Company's Cross-Mot. for Partial Summ. J. on the Number of Occurrence and in Opp'n. to Pl. Motors Liquidation Company DIP Lenders Trust's Mot. for Partial Summ. J. on the Number of Occurrences at 9.

[126]  *Id.* at 10.

[127]  *Id.* at 40–41.

In *Dow Corning Corp. v. Continental Cas. Co. Inc., et al.*,[128] Dow Corning Company ("*Dow I*") manufactured silicone-filled breast implants. Between 1964–1991, many women received these Dow implants.[129] By the early 1980s, numerous claimants alleged the silicone leaked, causing various autoimmune disorders.[130] The number of claimants escalated into the early 1990s.[131] And Dow sought coverage for these claims from its several insurers.

All of the insurers sold "occurrence" policies between 1962 and 1985. The policies covered Dow's liability "caused by or arising out of each occurrence."[132] The policies defined occurrence as:

> The term "occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.[133]

---

[128]    1999 WL 33435067 (Mich. Ct. App. Oct. 12, 1999).

[129]    *Id.* at *1.

[130]    *Id.*

[131]    *See id.*

[132]    *Id.* at *4.

[133]    *Id.* at *17.

Dow argued that each implantation was a separate occurrence. One excess carrier argued that the manufacture or sale of the silicone implants constituted one "occurrence," regardless of when implantation occurred.[134]

The Michigan Court of Appeals held that each implantation of breast implant products was a separate occurrence in the context of 19,000 lawsuits filed by more than 33,000 claimants.[135] The *Dow I* court held that there was "no basis in the policy language for construing the terms 'accident,' 'event,' or 'happening' necessarily to mean the manufacture and sale of breast implants."[136] Further, the *Dow I* court held that considering exposures to the breast implants to be "general conditions [] substantially the same" for all underlying claimants is highly questionable; the implants were at different locations when exposure occurred.[137]

In *Stryker Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,*[138] another case applying Michigan law, Stryker sought coverage for at least 71 claims seeking damages for injury allegedly caused by implantation of a defective artificial knee product. The artificial knees consisted of metal and ultrahigh

---

[134]   *Id.*

[135]   *Id.*

[136]   *Id.*

[137]   *Id.*

[138]   No. 4:01-cv-157-RHB, Doc. 603 (W.D. Mich. Aug. 27, 2004).

molecular weight polyethylene.[139]  After construction, the artificial knees were irradiated and stored in packages containing air.[140]  The radiation and storage purportedly weakened the knees' effectiveness, making them unsuitable for implantation five years post-sterilization.[141]  Several unfit knees were implanted.[142]  Stryker sought coverage from its insurers.

One insurer, National Union, argued that 67 claims it potentially covered were separate occurrences.  National Union's policy defined occurrence as "an accident, including continuous and repeated exposure to conditions, which results in Bodily Injury.  All such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence."[143]

The *Stryker* Court applied the "cause test," and found in National Union's favor:  there was not one continuous, uninterrupted cause of the implantation of expired products.[144]  Stryker retained ownership of each artificial knee until the

---

[139]   *Id.* at *2.

[140]   *Id.*

[141]   *Id.*

[142]   *Id.* at *4.

[143]   *Id.* at *8.

[144]   *Id.* at *10.

time of implantation. Stryker faced potential liability only when an individual artificial knee was sold and implanted.[145]

· Motors alleges *Stryker* and *Dow I* are inapplicable.[146] *Dow* added a premise requirement that Motors's policies lack. That is, Dow's breast implantation failures constituted separate occurrences because the policy stated: "All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."[147] Motors's policy has no such location-specific requirement.

Motors argues *Stryker* is inapplicable because the artificial knees were allowed to expire prior to implantation. This expiration is an additional, independent link in the causal chain.[148] Motors claims its asbestos-containing products had no such additional, independent link. So, all of the claims arising out of the sale of its products should be deemed one occurrence.[149]

---

[145]    *Id.*

[146]    Motors Liquidation DIP Lenders Trust's Reply in Supp. of its Mot. for Partial Summ. J. on the Number of Occurrences & Opp. to Def. OneBeacon Ins. Co.'s Cross-Mot. for Partial Summ. J. on the Number of Occurrences at 14.

[147]    *Dow I*, 1999 WL 33435067 at *17.

[148]    Motors Liquidation DIP Lenders Trust's Reply in Supp. of its Mot. for Partial Summ. J. on the Number of Occurrences & Opp. to Def. OneBeacon Ins. Co.'s Cross-Mot. for Partial Summ. J. on the Number of Occurrences at 15.

[149]    *Id.*

Motors cites to *Associated Indem. Corp. v. Dow Chem. Co. ("Dow II")*[150] for support. In *Dow II*, Dow manufactured a resin used in natural gas pipeline installation.[151] Dow either manufactured the resin itself or supplied the components for others to manufacture it for placement in the gas pipes.[152] The resin never set properly, causing difficult installation and leakage.[153] Dow's insurers brought a declaratory judgment action seeking to determine the number of occurrences for the leaking pipes.[154]

Dow's primary insurer, to which the excess carriers followed form, defined occurrences as:

> [A]n event, including continuous or repeated exposure to conditions which results, during the policy period, in personal injury or property damage not intended from the standpoint of the insured. . . . All personal injury and property damage arising out of the repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.[155]

The *Dow II* Court held that the production of the defective resin was the sole, proximate, uninterrupted, and continuing cause of all of the property

---

[150]     814 F. Supp. 613 (E.D. Mich. 1993).

[151]     *Id.* at 614–15.

[152]     *Id.* at 615.

[153]     *Id.*

[154]     *Id.* at 616–17.

[155]     *Id.* at 617.

damage.[156] All of the resin was intrinsically harmful. There was an unexplained property or characteristic in its manufacture that caused all pipes into which it was installed to be deficient.[157]

Same here, Motors says. GM sold certain inherently defective products that caused injuries. There is no additional, independent link in the causal chain that had to be forged subsequent to the products' production and sale in order for them to become harmful.[158] To understand the parties' current positions, it helps to give an overview of the Court's two prior decisions in this case – those rulings having been rendered by the judge previously assigned.

The parties first sought summary judgment on occurrences in 2013.[159] Then, like now, Motors argued that the policies should be read that all claims funnel back to a single occurrence.[160] And Motors argued that Michigan and Delaware law both follow the "cause test": similar injuries caused by the continuous

---

[156] *Id.* at 623.

[157] *Id.*

[158] Pl. Motors Liquidation Company DIP Lenders Trust's Opening Br. in Supp. of its Renewed Mot. for Partial Summ. J. on the Number of Occurrences at 16.

[159] *Motors I,* 2013 WL 7095859 (Del. Super. Dec. 31, 2013).

[160] *Id.* at *1.

manufacture and sale of an intrinsically harmful product constitutes a single occurrence.[161]

The Insurers countered that summary judgment was premature. The Insurers implicitly agreed that a false conflict between Delaware and Michigan law existed.[162] Nonetheless, the Insurers argued a true conflict existed between the policy's occurrence definition and the parties' longstanding course of conduct.[163] The Insurers argued a latent ambiguity existed because the parties' course of conduct differed (greatly in this case) from the policy's language.[164] The Insurers had "years of claims handling data" showing that Motors treated each occurrence individually.[165]

The Court agreed that, at the litigation's then-early stage, a latent ambiguity could exist.[166] The Court reasoned that, if the Insurers could prove that the parties'

---

[161]   *Id.* at *2.

[162]   *Id.* at *3 ("As to 'occurrence,' the parties agreed at oral argument, and as presented above, there is no conflict of law. Both Michigan and Delaware agree that similar injuries caused by the continuous manufacture and sale of intrinsically harmful products, such as asbestos, is a single occurrence.").

[163]   *Id.* at *4.

[164]   *Id.*

[165]   *Id.* at *5.

[166]   *Id.* at *4 ("[Defendants] suggest the course of performance between GM and Royal altered the contract's plain terms. As the limited record suggests further discovery will likely lead to a different result than relying solely on the policy language, summary judgment must be denied.").

conduct modified their agreed-upon occurrence definition, the Insurers might prevail in spite of the language.[167]

The parties cross-moved for summary judgment again in 2015.[168] The focus then was the "patent disharmony between the primary and excess policies' triggers of coverage."[169] Until 1972, Motors's primary coverage was occurrence-based.[170] Motors and Royal bilaterally negotiated to replace the occurrence-based policies with "claims-reported" coverage.[171]

The Court found that Motors was judicially estopped from relitigating its post-1971 claims. As discussed more thoroughly above, Motors and Royal sued each other, both here and in Michigan, over Royal's primary coverage.[172] In that primary coverage litigation, Motors "unequivocally assured" this Court (actually both states' courts) that:

> [W]ith respect to the [post-1971] years of coverage, there is no justiciable issue[.] These are claims made policies.

---

[167]    *Id.* at *5 ("While it may be difficult to prove the parties established a standard different from the clear policy language, if Defendants are successful, they may be entitled to judgment despite policy language.").

[168]    *Motors II,* 2015 WL 10376123 (Del. Super. Ct. Nov. 25, 2015).

[169]    *Id.* at *1.

[170]    *Id.* at *2.

[171]    *Id.* at *2, *4.

[172]    *See* Sections II.B, IV.B, *supra.*

> We are not submitting these claims under them, and I don't know how much clearer we can say that.[173]

Additionally, the Court found that the parties' "latent ambiguity" discovery "clearly d[id] not help [Motors's] position."[174] The Court stated that "it is safe to say that the primary [policy] was never called-on to respond to a post-1971 claim. Similarly [Motors] never made a demand against an excess carrier concerning a post-1971 claim."[175]

The Court's analysis then must inform the Court's interpretation of the parties' "occurrence" dispute now. This is because "[a] successor judge overruling a decision of a predecessor judge of the same Court is strongly disfavored."[176] "Such a situation is guided by the doctrine of the law of the case so as to promote

---

[173]    *Motors II*, 2015 WL 10376123 at *3 (quoting GM's counsel unequivocal assurances to this Court); *id.* (and GM told the Michigan court: "General Motors has informed [Royal] that [*GM is*] *not claiming and will not claim under those remaining twenty years*. They don't believe us, but we submit that we are judicially bound; *we would be estopped to contend otherwise*.") (emphasis in original).

[174]    *Id.* at *9.

[175]    *Id.*

[176]    *New Castle Cty. v. Pike Creek Rec. Servs., LLC*, 82 A.3d 731, 744 (Del. Ch. Dec. 30, 2013) (citing *Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718 (Del. 1983) ("[W]e want to emphasize that we take a dim view of a successor judge in a single case overruling a decision of his predecessor.")). It is well-settled that once a decision is rendered by the same court that decision should stand. *May v. Bigmar, Inc.* 838 A.2d 285, n.8 (Del. Ch. 2003) ("The 'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears." (citation omitted) (internal quotation marks omitted)).

'fundamental fairness and . . . judicial efficiency.'"[177] Yet unlike *res judicata*, the "law of the case doctrine is not inflexible . . . it is not an *absolute* bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances."[178] "This is to ensure that, especially where the case is taken on by a successor judge, the parties are not 'entrapped by varying philosophies of different judges of the same Court in the case.'"[179]

Here, nothing suggests either a change in circumstances or injustice by applying the prior law of this case. In 2013, the Court found that Michigan and Delaware follow the "cause test," and that the parties' course of conduct may have changed how the Court should have interpreted the "occurrence" definition.[180] In 2015, the Court supplemented its 2013 decision, holding that Motors's post-1972 course of conduct comported with Endorsement 15's "game-changing" language. Nothing the parties have presented convinces the Court it should abandon the

---

[177] *Pike Creek Rec. Servs., LLC*, 82 A.3d, at 744–45 (quoting *Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994)). This is especially true in Delaware where often more than one judge will preside over an individual case during its pendency. *Frank G.W.*, 457 A.2d at 719 ("Considerations of courtesy and comity are particularly relevant in Delaware where it is not unusual for our Superior Court to have various judges involved at different stages of protracted cases.").

[178] *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000) (emphasis in original).

[179] *Pike Creek Rec. Servs., LLC*, 82 A.3d, at 745 (quoting *Frank G.W.*, 457 A.2d at 719).

[180] *Motors I*, 2013 WL 7095859 at *4–5.

general law-of-the-case principle: it should abide "in all instances except in those extraordinary circumstances where justice demands revisiting the merits of the parties' claims."[181] The Court finds no such extraordinary circumstances exist here.

There is a clear distinction between the parties' pre-1972 and post-1972 conduct. The post-1972 insurers have been dismissed from the case. The Court does not agree with OneBeacon that Motors is estopped from arguing the pre-1972 claims are one "occurrence." And the Court finds in these circumstances, under *Dow II*, they are one "occurrence."

Therefore, Plaintiff Motors Liquidation Company DIP Lender's Trust's Renewed Motion for Partial Summary Judgment on the Number of Occurrences is **GRANTED**. Defendants OneBeacon and Continental's Cross-Motions for Summary Judgment on the Number of Occurrences is **DENIED**.

### E. DETERMINING ALLOCATION

The Court has determined: that the OneBeacon policies transferred to Motors; that the 80,000 claims trigger the excess policies; that Royal's Suit Limitations Clause, to which OneBeacon follows form, does not bar Motors's

---

[181] *Pike Creek Rec. Servs., LLC*, 82 A.3d, at 745; *Frank G.W.*, 457 A.2d at 719 (noting exceptions to the general rule of restraint a successor judge follows in adhering to prior ruling "should be entertained only in extraordinary circumstances").

claims; and that the claims are to be treated as one occurrence. Now, the Court must determine how to allocate to the insurers any liability Motors incurs.

Motors alleges that the RLA35 language, to which OneBeacon follows, requires "all sums" allocation under Michigan law. OneBeacon argues that the language calls for "pro rata," or "time on the risk" allocation. Michigan courts have, on different occasions, followed "all sums"[182] and "pro rata" [183] allocation – depending on the contract language used. The overwhelming majority of cases, however, consider Michigan a "pro rata" state.[184]

*Arco Industries Corp. v. American Motorists Insurance Company* provides an example of Michigan's trend toward "pro rata" allocation. In *Arco*, plaintiff, a small automotive parts manufacturer, operated a manufacturing plant beginning in

---

[182]    *Dow I*, 1999 WL 33435067 (Mich. Ct. App. Oct. 12, 1999).

[183]    *See, e.g., Arco Industries Corp. v. American Motorists Ins. Co.*, 594 N.W.2d 61 (Mich. Ct. App. 1998).

[184]    *See, e.g., Cont'l Cas. Co. v. Indian Head Indus., Inc.*, 666 F. App'x 456, 464–65 (6th Cir. 2016) ("While the Michigan Supreme Court has not determined which allocation method applies, other courts have concluded that the pro rata method of allocation applies under Michigan law.") (citing *City of Sterling Heights v. United Nat'l Ins. Co.*, 319 F. App'x 357, 361 (6th Cir. 2009); *Decker Mfg. Corp. v. Travelers Indem. Co.*, 106 F.Supp.3d 892, 895 (W.D. Mich. 2015); *Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa.*, 916 F.Supp.2d 813, 832–33 (W.D. Mich. 2013); *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2005 WL 1610663, at *7–8 (W.D. Mich. Jul. 1, 2005); *Century Indem. Co. v. Aero–Motive Co.*, 318 F.Supp.2d 530, 545 (W.D. Mich. 2003).; *see also id.*, 666 F. App'x at 465 ("The Michigan Court of Appeals has recognized in at least three other instances that liability for continuous injuries should be measured on a pro rata basis.").

1967.[185] Plaintiff used volatile organic compounds to clean parts during the manufacturing process and to remove plastisol from the plant's floors.[186] The compounds drained down a trench into an unlined seepage lagoon away from the plant.[187] The compounds contaminated the lagoon and groundwater.[188] Michigan's Department of Natural Resources sued Arco for cleanup costs. The trial court allocated Arco's risk on an "other insurance" approach.[189]

On appeal, the Michigan Court of Appeals approved of a "time-on-the-risk," or "pro rata" approach.[190] Under American Motorist Insurance Company's ("AMICO") policy, coverage was available to Arco when damage occurred "during the policy."[191] The court of appeals stated that the "logical corollary" to AMICO's occurrence definition was that "AMICO must provide coverage for damage sustained 'during the policy period' [only,] but not for the years outside the policy period."[192] The court of appeals reversed the trial court's "other

---

[185]  *See Arco*, 594 N.W.2d at 64.

[186]  *Id.*

[187]  *Id.*

[188]  *Id.*

[189]  *Id.* at 68.

[190]  *Id.* at 69.

[191]  *Id.*

[192]  *Id.*

insurance" allocation, and required it to implement AMICO's risk using the time-on-the-risk method.[193]

The parties only cite to one Michigan case prescribing "all sums" allocation. In *Dow I,* Plaintiff Dow Corning provided silicone gel breast implants from approximate 1964–1991.[194] By 1991, a "flood of litigation" hit, costing approximately $4 billion.[195] Dow sought coverage from its myriad insurers.

All of Dow's insurers sold "occurrence" policies from 1962–1985. Dow argued for "joint and several" allocation.[196] Its insurers argued for "pro rata allocation with policyholder participation."[197] The relevant allocation provision in the subject policies stated:

> The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the insured for all sums which the Insured shall be obligated to pay by reason of the liability (a) imposed upon the Insured by law, or (b) assumed under contract or agreement by the Named Insured for damages, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" on account of: . . .

---

[193]    *Id.* at 70–71.

[194]    *Dow I,* 1999 WL 33435067 at *1.

[195]    *Id.*

[196]    *Id.* at *6.

[197]    *Id.*

personal injuries, caused by or arising out of each occurrence.[198]

The Michigan Court of Appeals found in Dow's favor by linking allocation with the policies' "occurrence" definition. "Occurrence," in these policies, was defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period."[199] Further, the policies contained a provision that "in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuous at the time of termination of this policy, The Company will continue to protect the Insured for liability in respect of such personal injury or property damage without payment of additional premium."[200] Reading these three provisions together, the *Dow I* court found "all sums" applied.[201]

The *Dow I* court distinguished its "all sums" decision from *Arco*'s "pro rata" allocation. First, *Dow I* involved a different "occurrence" definition than *Arco*:

---

[198]  *Id.*

[199]  *Id.* at *7.

[200]  *Id.*

[201]  *Id.* at *8 ("Because we read the policy language at issue here as requiring defendants to pay 'all sums,' and because the panel in *Arco* was construing different language, we decline to extend *Arco* to the present case. The trial court correctly held that, under the relevant policy language, defendants are liable for 'all sums.'").

*Dow I*'s included "continuous or repeated exposure."[202] Second, *Dow I*'s policy included the specific clause protecting the insured after the policy expired.[203]

*Arco*'s pro rata allocation is the sensible and right approach here. While Motors seeks *Dow I's* application, there are several reasons the policies here hew closer to *Arco*. The RTP06000 policy contains a temporal limitation on occurrence: an injury that occurs *during the policy period*. It follows, therefore, that the parties intended to cut-off occurrences at some point. The RTP06000 policy simply does not contain the additional, interminable language that *Dow I*'s policy did.[204]

Motors also focuses on the phrases "all sums" and "arising out of" to support its "all sums" allocation argument. Alone, those terms *could* support an all sums determination. Yet, they did not in *Arco*[205] And Motors does not cite one Michigan case using that same language without additional supporting policy language (like *Dow I*'s). Michigan law requires an insurance policy to be read as a whole, so that all of the policy's provisions make sense. The policies here clearly

---

[202]    *See id* at *7.

[203]    *Id.* at *8.

[204]    *See Stryker Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 2005 WL 1610663, at *7 (W.D. Mich. Jul. 1, 2005) (applying *pro rata* allocation and distinguishing *Dow* because *Dow's* clause extending coverage was not present in this case).

[205]    *See, e.g., Arco,* 594 N.W.2d at 64 ("AMICO agreed to 'pay all sums which the insured shall become legally obligated to pay as damages because of (a) a bodily injury or (b) property damage to which this insurance applies.'").

state that coverage will be provided for injuries that occur during the policy period. Nothing more.

In turn, Plaintiff Motors Liquidation Company DIP Lender's Trust's Renewed Motion for Partial Summary Judgment on Allocation is **DENIED**. Defendants OneBeacon and Continental's Cross-Motions for Summary Judgment on Allocation is **GRANTED**.

## V.   CONCLUSION

The insurance policies for which OneBeacon and Continental are (or may be) responsible were not excluded from the asset transfer between GM and Motors during GM's bankruptcy. Those policies can be triggered. The Suit Limitations Clause of the lower level policies does not bar Motors's suit here under the OneBeacon and Continental policies. All of the remaining pre-1972 asbestos claims for which Motors seeks coverage, under the circumstances here, are one "occurrence." And allocation must be done on a pro rata basis.

Accordingly, for there the reasons stated above, the parties' various summary judgement motions are disposed as set forth herein.

**IT IS SO ORDERED.**

**Paul R. Wallace, Judge**